WILL OF PABST: SOEHNLEIN, Respondent, vs. SOEHNLEIN and another, by guardian *ad litem,* Appellants.

*April 7—June 1, 1911.*

*Corporations: Conversion of surplus into capital: Stock dividends: Apportionment between term owner of stock and remaindermen: Intention: Presumptions: "Income:" Trusts and trustees: Supreme court: New questions: Choice between conflicting authorities.*

1. In the absence of some prohibition in the written law or charter of a corporation to the contrary, surplus earnings, distributable to stockholders, may be converted into permanent capital by increasing the stock and distributing such increase as a dividend.
2. Corporate surplus earnings distributable as a dividend may be capitalized and distributed as preferred as well as common stock, in the absence of restraint in the written law or corporate charter.

3. Unless the written law or charter of a corporation forbids, it may declare a dividend out of surplus assets existing in money or out of money obtained against such assets, or by capitalizing such assets and making the distribution in common or preferred stock, or both.

4. Secs. 1795a and 1765, Stats. (1898), affirm the foregoing, incorporating the same into written law.

5. If a corporate dividend be declared payable in stock and the stockholders unite in turning such stock into money so as to divide the proceeds in that form and the conversion is made to that end, as between a term beneficiary and a remainderman the one entitled to the dividend in new stock, is entitled to participate in like proportion in the converted fund.

6. The primary principle as to direction of corporate dividends declared out of surplus assets during a term, accumulated during such term, as between a term owner and remainderman, is that the possessor of corporate stock may convey it to one for a time, remainder over to another, free from authority of the corporation to disturb the purpose thereof; that not militating, however, against corporate power, exercised in good faith, to retain surplus and thus enhance the value of corporate shares or to distribute the same.

7. The principle logically resulting from the foregoing is, that as to surplus, accumulated during a term,—regardless of how carried on the corporate books, or in what form of property received or how converted or reconverted into other forms before distribution as a dividend, and regardless of the manner of dividing, or intention of the corporate officers in the matter,—a person owning stock for such term is entitled to all dividends declared therefrom, if the creator of the special interest so intended at the time of creating it.

8. A companion principle to the foregoing is, that if one conveys stock to a person for a term and remainder to another and in no other way expresses his intention as to dividend incidents, the presumption of fact is that he intends the term owner to have all such incidents springing from distribution during the term out of gains to the corporation during such period.

9. All dividends on corporate stock, in the absence of any efficient showing to the contrary, are presumed to be out of income.

10. The sole test as to whether the term owner or remainderman of stock shall have any particular dividend, is the intention of the creator of the two interests, and that is presumed to favor the term owner if the dividend was declared during the term out of income accumulated during that period.

Soehnlein v. Soehnlein, 146 Wis. 330.

11. "Income" in the foregoing means all accumulations whether in money or property, and regardless of the form when first obtained or how converted and reconverted before declaration of a dividend.

12. A corporation which capitalizes surplus profits and distributes the new stock as a dividend, has as much assets after the increase of stock as before, but it has more liabilities. The new thing obtained by a stockholder is, to all intents and purposes, new property, the same as if the corporation had distributed money and the recipient had returned it for stock.

13. Stock received as a dividend is a thing of value, salable and enjoyable separate from the base stock and is therefore an incident of the latter the same as a money dividend.

14. If a corporation capitalizes its surplus accumulated from income and makes a dividend in stock the new stock represents old assets held against new liabilities and, as regards owners of old stock, is a distribution of income.

15. If, in particular circumstances, the term owner of corporate stock is entitled to the benefit of a dividend distribution of corporate assets if made in the form of cash, he is entitled to it, whether large or small or whether made in cash or stock or in any other way.

16. In making a choice between conflicting lines of authority respecting a question which is new here, this court will incline to the doctrine of the federal supreme court in case of its having spoken upon the subject, there being no great preponderance in number of decisions and logic to the contrary.

17. The rule stated in the last foregoing does not constrain to adopt the doctrine of *Gibbons v. Mahon*, 136 U. S. 549, it being contrary to the great weight of authority, as to number of decisions and logic as well.

18. If a person by will or otherwise creates a trust in corporate stock for the benefit of another providing that such other shall have the income thereof for a stated period, the term "income" covers all distributions made by capitalizing surplus created by income and distributing stock evidence of liabilities or otherwise.

19. The opinion in *Pabst v. Goodrich*, 133 Wis. 69, is restrained to conform to the decision there and to the decision in this case.
    [Syllabus by MARSHALL, J.]
    TIMLIN, SIEBECKER, and KERWIN, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Affirmed.*

Special proceedings to obtain judicial directions respecting ownership and disposition of trust funds.

The facts found by the trial court are undisputed. The following is a summary thereof so far as relates to *Emma Soehnlein* and her children:

1. January 1, 1904, Frederick Pabst died, testate. He made a deed of gift at the time of executing his will and both took effect. By the deed a trust in $700,000, or thereabout, par value of the capital stock of the Pabst Brewing Company, was created for *Emma Soehnlein.* By the will he created a similar trust in one fifth of his estate.

2. The following were beneficiaries under the will and deed: His widow Maria, who deceased October 3, 1906, Gustave G. and Frederick, Jr., sons, Maria Goodrich, a daughter, *Emma,* a daughter, wife of Frederick William Soehnlein, by whom she has living a daughter *Edith,* born October 13, 1903, and a daughter *Beatrice,* born January 12, 1906, and Emma Maria Pabst, born December 25, 1890, child of deceased's daughter, also deceased, Elsbeth von Ernst.

3. In due course the Wisconsin Trust Company became sole trustee under both will and deed.

4. Said Gustave G., Frederick, Jr., Maria Goodrich, *Emma Soehnlein, Edith* and *Beatrice Soehnlein,* and Emma Maria Pabst are the only persons interested under the trusts created by both deed and will.

5. At the date of the instruments mentioned Pabst Brewing Company was a Wisconsin corporation with 10,000 shares of paid-up capital stock of $1,000 each. The will provided that, in case of *Emma Soehnlein* surviving her mother and then having a child ten years old living, she should have one fifth of the estate, but in case of her not so surviving and having such issue the property should remain in trust, *Emma* receiving the income thereof until the event of her having a child ten years of age occurring and then the *corpus* be delivered to her, and in case of her decease, not having received the

property but leaving a child or children, the income to go to them equally until one arrive at the age of ten years and the *corpus* to them likewise go.    The trust deed created for *Emma* a trust in one fourth of 2,840 shares of corporate stock upon like conditions.

6. Pursuant to the deed, 710 shares of the stock were set aside for *Emma* and pursuant to the will, including a distribution hereafter referred to, 418 shares were so set aside.

7. December 11, 1906, the company possessed 3,322 shares of its stock, part purchased before and part after the decease of Mr. Pabst, all at a cost of $4,495,629.89, which was somewhat less than the company's surplus at such decease.

8. On said December 11th said treasury stock was duly and equally distributed among the stockholders, making the total of the trust shares to *Emma* 1,063 under the deed and 418 under the will.

9. After the trusts all took effect and prior to May 10, 1910, the corporation accumulated a surplus from earnings of $3,086,562.02.

10. Such net earnings were available for distribution among the stockholders as a dividend in the discretion of the directors.

11. $708,894.12 of such available funds was in the form of an investment of 736 shares of the common stock of the corporation.

12. January 13, 1910, and soon thereafter, corporate proceedings were duly had changing the 10,000 shares of the corporate stock of $1,000 each into 100,000 shares of $100 each and increasing the capital stock on account of the aforesaid net earnings by 20,000 shares of seven per cent. preferred stock of $100 par value, each.

13. At the time of such change it was contemplated by the stockholders that such preferred stock and $500,000, par value, of the common stock, out of that in the treasury, should be distributed as a dividend, the idea being to convert all into

·cash, affording the stockholders a cash dividend equivalent to the market value of such stock. To that end arrangements were made for the conversion as soon as the distribution of ·stock should be effected, so that the stockholders might, in effect, receive cash instead of stock, the purpose being payment of a cash dividend aggregating the net income available therefor earned subsequently to January 1, 1904, without reducing ·the cash resources of the corporation.

14. January 13, 1910, due proceedings were ·had for payment of the dividend as contemplated.

15. Such payment was subsequently effected, 3,196 shares ·of the preferred stock and 798+ shares of the common stock being awarded to the trustee under the Soehnlein trusts; the ·same with the other dividend stock being converted into cash, making the proceeds of the Soehnlein dividend stock $212,546.51 on account of the trust created by deed and $83,578.97 on account of the trust created by will, or $296,125.48 in all.

From such facts the court concluded as matter of law:

*First.* The stock dividend was wholly based on net income of the corporate business, accumulated subsequently to the death of Mr. Pabst, said income being available for dividend payments without impairing the capital of the corporation or its surplus as the same existed on such date, and the dividend stock and proceeds thereof, in the way the matter was handled, incident to the Soehnlein trust stock, belonged to *Emma Soehnlein,* the beneficiary *in præsenti* of the income from such stock.

*Second.* The trustee under the will and also under the deed creating the Soehnlein trusts, should pay the aforesaid aggregate sum with all interest accumulations up to the date of payment, to *Emma Soehnlein.*

Judgment was rendered in accordance with the foregoing.

The children of *Emma Soehnlein,* by their guardian *ad litem,* appealed, claiming that the dividend stock, and hence

the proceeds thereof, belonged to them as owners of the *corpus* of the trust property.

*Charles M. Morris,* guardian *ad litem,* for the appellants.

For the respondent there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Alfred R. Cook,* of counsel, and oral argument by *Mr. T. W. Spence* and *Mr. Cook.*

MARSHALL, J.    The facts here must be regarded undisputed.    Thereby a very simple case is presented of distributing net accumulations of a corporation from ordinary operations of its business during the existence of a trust in part of its capital stock, created by a conveyance in general terms, of the beneficial interest therein to one person for a term, remainder over to another or others; such distribution being in the form of common stock in which profits had been invested, and new preferred stock, both changing surplus into liabilities to stock or accumulated income into permanent capital.    In such circumstances who takes the distributive share, the term tenant or the remainderman?

There is no question here as to legitimacy of distribution or increase of stock.    Indeed, it is not perceived how any could well be raised.    There is no legal objection, in the absence of some statute to the contrary, to a corporation declaring a dividend, payable in stock, out of its net income, leaving its ordinary capital unimpaired.    That method is common. True, the general conception of dividend incidents to corporate stock is payment from time to time out of net income of moderate amounts, somewhat in the nature, as to regularity of payment and amount thereof, of interest on money investments represented by notes and bonds.    But for convenience of the corporation and according to the judgment of directors, dividends out of net earnings carried as undivided profits, or surplus, or otherwise, and existing in cash or property, may be made in cash or stock of any legitimate kind by some method which will operate to actually transfer distrib-

utable assets—those not impairing capital—to individual own-
ership of stockholders, or constructively do so by beneficially
giving them additional shares of stock, thus changing the dis-
tributable property into permanent capital against new lia-
bilities.   Moreover, by the written law of this state the stock
method of distribution is recognized as legitimate and ex-
pressly authorized.

Sec. 1765, Stats. (1898), provides that

"Any corporation which has invested or may invest its net
earnings or income or any part thereof in permanent addi-
tions to its property or whose property shall have increased in
value, may lawfully declare a dividend payable to stockhold-
ers upon its capital either in money or in stock to the extent of
the net earnings or income so invested or of the said increase
in the value of its property; but the total amount of such divi-
dend shall not exceed the actual cash value of the assets owned
by the corporation in excess of its total liabilities, including
its capital stock."

That is but a statutory declaration of what has become un-
written law by the uniform trend of decisions.

Note that, independently of any statutory provision, the
distribution of net income may not only efficiently change net
assets, accumulated from income or increase in value of prop-
erty, into additional stock liabilities, balanced by a transfer of
such net assets to fixed capital, but the new stock may take the
form of preferred.   Moreover, at this point, the legitimacy of
such a transaction is put beyond possible question by sec.
1759a, Stats. (1898), which provides that a corporation

"May issue preferred stock either at the time the common
stock is issued in the first instance or at any time afterwards
if all of the shareholders consent thereto.   Such preferred
stock may be so issued as to secure to the holder thereof the
payment of dividends out of profits at a specified rate before
dividends shall be paid upon the common stock, and for pay-
ment of such dividends accumulated or in arrears thereon;
but such preferred stock shall give no preference over common
stock in the distribution of corporate assets other than profits,

and dividends thereon shall in no case be paid out of the corporate assets not accruing from profits. . . ."

The dividend in question must be regarded as having been actually paid in stock. The outside arrangement to which all stockholders as individuals were parties, though contemplated by the directors in making the dividend whereby the new stock was converted into money and, in effect, reached the stockholders in that form, makes no difference. The agent in the conversion acted for the individual owners, not for the corporation. Whoever was entitled to a distributive share of the stock became entitled to a like share of the proceeds of the sale thereof. The contest now is over such proceeds, but the right to the latter governs the right to the former. In other words, if the term beneficiary was entitled to the stock· dividend she is entitled to the money derived from the sale of the stock, as the trial court decreed, and not otherwise, and the judgment must be affirmed.

Notwithstanding some incidental allusions to the matter in *Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398, the proposition for solution now has not heretofore been considered for decision in this court. That case should not be read to the contrary, notwithstanding, it must be said, a different idea might be derived from reading the case as a whole, in the absence of some declaration to the contrary as made here.

There is much judicial and elementary literature in respect to the subject of discussion elsewhere but, in the aggregate, it is of such a nature as to rather confuse and render obscure any general logical basis for any general rule with which all authorities can be harmonized, if any such exist. It seems, at least without careful analysis, as other courts and text-writers have observed, that such authorities are in irreconcilable conflict. That is certainly true, as regards the dominant feature in the decisions upon the one side, which are few in number, after eliminating those reaching practically the same result but without appreciating the real basis for it, adopted

by the supreme court of Massachusetts to which all refer.
Therefore, little or no benefit can be derived from an exten-
sive discussion of mere case law. The better way is to dis-
cover the essential principles involved, if that can be done, and
for a rule, trace the operation of such principles to a logical
result. We will endeavor to do that, but give more than a
passing notice to the decision of the federal supreme court,
which, ordinarily, this court would follow in regard to a ques-
tion in respect to which it had not theretofore spoken.

Further suggesting the perplexities of the situation from
the point of view of case law, we read of the American or
Pennsylvania rule, the Massachusetts rule, Maine rule, New
York rule, English rule, and perhaps others. There are ad-
herents, in general, in some jurisdictions to one rule, in others
to another, and so on through the list, with exceptions accord-
ing to the varying views of judges, in the aggregate creating
about as unsatisfactory a condition on a very important sub-
ject as could well be imagined.

Very naturally, in the situation we have pictured, without
exaggeration it is thought, counsel for appellants appeal to the
court to apply the rule stated in *Topolewski v. Plankinton P.
Co.* 143 Wis. 52, 126 N. W. 554, and others in this court,
viz.: in making a choice between conflicting lines of authority
on an important legal question, there being no great prepon-
derance in number of decisions and logic in favor of a par-
ticular doctrine, this court will incline to the one indorsed by
the federal supreme court, and thus, as counsel think, adopt
the so-called Massachusetts rule, making all stock dividends,
regardless of whether declared out of profits accruing before
or after the creation of a term interest or interest in remain-
der in the stock, go to the owner of the latter, *Gibbons v.
Mahon,* 136 U. S. 549, 10 Sup. Ct. 1057, being relied on.

There are several difficulties in following the claimed doc-
trine of the federal supreme court under the rule suggested.
First, there is a great preponderance of authority against the

doctrine actually declared in *Gibbons v. Mahon*. Second, there is a still greater preponderance against the doctrine claimed to have been there declared. Third, the reasoning in the case is manifestly infirm at some points. Fourth, the great preponderance of authority not only in number of decisions but in logic is against the doctrine of the federal case. Moreover, instead of such case being an indorsement of the so-called Massachusetts rule, as is found stated in some textbooks, the basic feature of it is opposed thereto.

It is well said by learned text-writers that the doctrine that where there is an ownership of stock for a term and a remainder over, income accumulated during such term and distributed as dividends, regardless of how distributed, goes to the owner for the term in the absence of manifest intention otherwise by the creator of the estate, obtains in all but a very few states of the Union. 2 Cook, Corp. (6th ed.) § 554. The doctrine so dignified is stated by such text-writer, supported by a long line of authorities, thus:

"In disposing of stock or property dividends, as between tenant and remainderman" the court may "properly inquire as to the time when the fund out of which the extraordinary dividend is to be paid was earned or accumulated, and also as to the method of accumulation. If it is found to have accrued or been earned before the life estate arose, it may be held to be principal; and, without reference to the time when it is declared or made payable, to belong to the *corpus* of the estate, and not to go to the life tenant. But when it is found that the fund, out of which the dividend is paid, accrued or was earned, not before but after the life estate arose, then it may be held that the dividend is income, and belongs to the tenant for life."

The federal court, somehow, got, it seems, a wrong idea of the authorities. It was suggested that the only states holding contrary to its views were Pennsylvania, New Hampshire, and New Jersey, whereas, as the learned text-writer, in effect said, as before indicated, one could almost call the roll of the

other states in favor of the contrary, the exceptions being limited, probably, to Rhode Island, Georgia, Massachusetts, Illinois, and Connecticut; some of these being subject to elimination when the real basis for the doctrine adopted is appreciated, as for instance Georgia where there is a statute on the subject.

Significant among the jurisdictions not mentioned by the federal court opposed to its favored doctrine are New York, Maine, Maryland, South Carolina, and Kentucky.

The reference by the federal court to New York cases is quite misleading and unfortunate as the following will show. A long line of adjudications in New York are to the effect that a distribution of income made during the pendency of the term interest in stock, and accumulated during such term, whether distributed by means of a stock dividend or otherwise, goes to the term holder. As for example, in *McLouth v. Hunt,* 154 N. Y. 179, 48 N. E. 548, it was remarked that the decisions in general are in hopeless conflict; that those in England, favored by the federal court, were not well considered, and that the trend of decisions in this country, as well as the weight of argument and reason, is in favor of the doctrine that income accumulated during a life interest in stock and distributed in the form of a stock dividend, goes to the life tenant. In short, the doctrine of the Massachusetts court and the federal court was unqualifiedly condemned. To point such condemnation and that there is no difference, in the circumstances of the proposition under discussion, between a cash and a stock dividend, these words of Lord Chancellor ELDON were referred to with approval: "As to the distinction between stock and money, that is too thin; and if the law is, that this extraordinary profit, if given in the shape of stock, shall be considered capital, it must be capital if given as money."

The doctrine that, in the circumstances here, a stock dividend goes to the term beneficiary wherever a cash dividend

would, and that the only test is whether the dividend fund was accumulated and declared during the existence of the particular interest, was adopted in New York long before the decision referred to and has been emphasized in unmistakable' terms since. In *Lowry v. Farmers' L. & T. Co.* 172 N. Y. 137, 64 N. E. 796, speaking of such right of the term beneficiary the court said:

"Had this dividend of fifty per cent. been declared and paid in cash, would there have been much doubt about plaintiff's right to receive it? . . . What reasonable, or substantial, distinction is there, in principle of ownership, between a dividend which is paid in stock and one which is paid in money, when either is based upon a division of earnings? Mr. Morawetz, in his work on Corporations (§ 468), has observed, with respect to such stock dividends, that, 'in substance and effect, it amounts to a distribution of profits among the shareholders in cash and a subsequent purchase of new shares in the company with the sums distributed.' . . . That the value of the shares of stock has been lessened by a dividend is a fact of no relevancy in determining the question of whether the dividend is to be regarded as income to the life tenant, or as capital for the remainderman. That question will be determined by the origin of the dividend. . . . That which the directors of the corporation distribute among its stockholders, without entrenching upon capital, must be comprehended within the term 'profits' and we should assume that the testator intended that what might be paid in that way should belong to the beneficiary. There is no question of diminishing the capital; nor of increasing the capital for any corporate purpose, or need. It was, simply, a mode of distributing the profits earned by the employment of the capital."

That doctrine was particularly reaffirmed in *Robertson v. De Brulatour*, 188 N. Y. 301, 80 N. E. 938, the court holding that the directors of a corporation cannot make a term beneficiary of capital stock, or the owner in remainder, the proper payee of a dividend declared out of surplus, according to their manner of declaring it—that a stock dividend out of surplus earnings goes to the life tenant unless there is a clear indication that the creator of the tenancy intended otherwise.

One more reference to the federal case will suffice to show that it should not be regarded as persuasive in favor of appellants' position. The court, at one point, seems to have overlooked the fact that, by the Massachusetts rule, the intention of the creator of the term and remainder over, is immaterial; that the whole matter is governed by the corporate action and intention in declaring the dividend. The latter court remarked in *D'Ooge v. Leeds,* 176 Mass. 558, 560, 57 N. E. 1025:

"Everything is made to turn upon the action of the corporation. A simple rule is to regard cash dividends, however large, as income, and stock dividends, however made, as capital. . . . The simple question in every case is whether the distribution made by the corporation . . . is of capital to be held as an investment in the corporation. While this arbitrary rule may sometimes defeat the intention of the testator, in most cases it accomplishes the result intended."

We need not pause to point out, at length, the illogical nature of that doctrine. The result of it is to give to corporate officers, by the mere form adopted by them for distributing surplus earnings, power to defeat the purpose of a person in creating a life or term interest in stock. The federal court seemingly fell into some confusion in respect to the matter in supposing it was following the Massachusetts rule, and yet saying:

"In ascertaining the rights of such persons [term beneficiary and owner in remainder], the intention of the testator, so far as manifested by him, must of course control; but when he has given no special directions upon the question as to what shall be considered principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnings, and to have intended that the determination of that question should depend upon the regular action of the corporation with regard to all its shares." 136 U. S. 559.

That is equivalent to saying—the directors of a corporation have a right to convert surplus earnings, whether accumulated

during the existence of the precedent term or before, into permanent capital, issuing stock as a dividend therefor, and as to such a distribution, though really of capital, the creator of the precedent term can manifest an intention that the benefit shall go to the term owner, and in such case such intention will control, but in the absence of such manifestation the law will supply the intention by presumption, to the effect that a distributive share of capital stock during the term shall go to the owner in remainder.

Notwithstanding the federal court thus unequivocally declared for dominance of the intention of the creator of the particular interest, instead of that of the corporation in making the dividend, supposing it was following the Massachusetts and English rule, it also used this language:

"Whether the gains and profits of a corporation should be so invested and apportioned as to increase the value of each share of stock, for the benefit of all persons interested in it, either for a term of life or for years, or by way of remainder in fee; or should be distributed and paid out as income, to the tenant for life or for years, excluding the remainderman from any participation therein, is a question to be determined by action of the corporation itself." 136 U. S. 558.

That precedes the declaration that the intention of the creator of the particular interest, after all, controls, and is followed by this:

"Therefore, when a distribution of earnings is made by a corporation among its stockholders, the question whether such distribution is an apportionment of additional stock representing capital, or a division of profits and income, depends upon the substance and intent of the action of the corporation, as manifested by its vote or resolution; and ordinarily a dividend declared in stock is to be deemed capital, and a dividend in money is to be deemed income, of each share." 136 U. S. 559.

The three declarations from one viewpoint would seem to present a plain contradiction. But out of the ambiguity can be read, pretty clearly, the idea that, presumptively, a stock

dividend is to be regarded as capital, and so to pass, in such a case as this, to the owner in remainder, according to the presumed intention of the creator of the two interests, nothing appearing efficiently to the contrary; thus only changing the rebuttable presumption of fact in favor of the life or term tenant as most courts hold, to such a presumption against him, and repudiating the Massachusetts doctrine that the intention of the creator of the particular interest in the stock is immaterial.

It will be observed that in *McLouth v. Hunt*, 154 N. Y. 179, 48 N. E. 548, the custom of the New York court to follow the federal supreme court on new and doubtful questions, in harmony with the declaration in *Topolewski v. Plankinton P. Co.* 143 Wis. 52, 126 N. W. 554, was suggested, yet the court reached the conclusion that, in the particular instance, the rule could not apply.

In the ultimate, as we have seen, the infirmity in the federal case lies in the rule of construction adopted; that is in holding that a distribution to stockholders of dividend stock is presumed to be a distribution of the same, as capital, not as income, and that in case of a term and remainder ownership in stock, the presumption, nothing appearing efficiently to the contrary, is that the creator of the separate interests intended such a dividend to go to the latter.    Reverse the first presumption and the last logically must go with it.    In any event the basic principle of the federal case, is that the intention of the creator of the two interests in the stock governs, not the action of the corporation as regards making a distribution in cash or stock, in harmony with the great weight of authority in this country.    So it will be seen text-writers who have dignified, while condemning, the doctrine, found in its fulness not to extend much beyond Massachusetts, by proclaiming that the "supreme court of the United States has thrown the. great weight of its authority in favor thereof," fail to analyze carefully or understandingly *Gibbons v. Mahon, supra.*

To our minds it seems plain, independently of any written

law on the subject, that, presumably, all dividends regardless
of how made are out of increase of assets properly convertible
into surplus, treatable as mere income and so treated in mak-
ing the dividend; whether made in one or another of the usual
ways.    Such is the rule in most jurisdictions.    It seems just
as plain that, when a person transfers stock by will or other-
wise to be held beneficially by one for a time with remainder
over to another, nothing appearing to the contrary, the pre-
sumption of fact is that all dividend distributions of assets,
made out of distributable earnings, accumulated during the
existence of the term and so dispersed during the term, go to
the term beneficiary.    To say that when a stockholder conveys
his stock, as in this case, he thinks otherwise than that the
term owner will take all benefits, as to such stock, of dividends
out of earnings made during such term, regardless of the man-
ner of making the dividends, seems contrary to common
knowledge.    To use the homely but expressive phrase, so dig-
nified by the English chancellor: a distinction between stock
dividends and money dividends declared out of accumulations
during a given period, saying in a case like this, the former is
a distribution of capital and goes to the remainderman and
the latter is a distribution of income and goes to the life ten-
ant, is "too thin."    It loses sight of the fact that the real
question is not whether a stock dividend, so made, is capital as
between the corporation and the stockholder, but whether it
is such as between the term owner and the remainderman; and
the further fact that the intention of the corporation officers
is immaterial, while that of the creator of the special interest
is everything.    Call it a distribution of income in one case
and of capital in the other, merely because in the latter excess
assets, derived from corporate income of some sort, is capi-
talized in the operation—however illogical it may be to change
the name merely because of changing the form,—yet the nat-
ural thought will remain undisturbed, that the creator of the
term intended all such benefits should be incident thereto.

Thus it will be seen that the primary principle recognized by most authorities in this country, including the federal supreme court, is that the owner of corporate stock may convey the beneficial interest therein, in whole or in part, for a time to one and the whole ownership in remainder to another, unhampered by any power lodged in the corporation to disturb the purpose of the conveyance; recognizing, however, corporate authority, acting in good faith, to retain surplus earnings or other accumulations during such time; thus enhancing the value of the shares, or to distribute the same. From that follows, logically, that, whenever such a distribution is made—whether by capitalizing the surplus accumulated during such time, meaning the excess of assets in value over and above liabilities to stock, accumulated during such time, either in cash and retained as such, or converted into property, or accumulated in any other of the ways indicated in sec. 1765, Stats. (1898), of creating distributable surplus, and regardless of whether carried in a surplus account or that and one of undivided profits, or otherwise, or by several or all ways of carrying such assets in the accounting system adopted, and issuing, ratably, new shares, or paid out of cash on hand, or by legitimately obtaining cash on account of the surplus assets and charging the same against some appropriate account; and whether an ordinary or extraordinary or bonus dividend; or whatever called—the distributive shares, as regards the owner of the stock presently, is income and, so, an incident of the ownership during the period of accumulation, declaration and distribution, if the creator of the particular term so intended.

The next principle, logically springing from the foregoing, and the rule of the common law as well, sanctioning distribution of corporate surplus assets in the way suggested, and the custom existing as matter of common knowledge to make dividends out of surplus assets in all the ways mentioned, is that when an owner of stock conveys the same to another for a term

without efficiently manifesting to the contrary, the presumption of fact is that he intends the term owner to enjoy all the income incidents of the stock during such term. The idea is that once income of the corporation during the term in circumstances as in this case, always income during the term if distributable and distributed to stockholders during the term, no matter what form of property embodies it at first or what changes occur in form before the distribution occurs.

Applying the foregoing to this case, the learned trial court could not well have reached any other legal conclusion from the facts found than the one complained of, *i. e.* that the stock dividend, and hence the proceeds of the sale of the dividend stock, as to the interest in question, belonged to *Mrs. Soehnlein.* Neither in the trust created by deed or that created by will, is there any indication that it was thought she would have during her term anything less than the whole beneficial interest. On the contrary the indications are unmistakable from the plain language used that she was intended to have all such benefits. Such language was very broad and comprehensive. In the deed all dividends paid on stock were expressly referred to. No exception was made, expressly or by reasonable inference. Coming to the particular term and referring to the precedent broad characterization, the creator of the trust said: The dividends thereof shall be paid to said *Emma Soehnlein,* etc. In the trust created by will, manifestly intending to convey the same idea as that indicated in the deed, the net income, the whole of it, from the stock was disposed of for the period preceding the one in question. Coming to the later period, referring to income before spoken of, the testator provided "said *Emma* receiving the income thereof until," etc., "said part of my estate shall continue to be held in trust by my executors and trustees during the life of said *Emma* and the income thereof annually paid to her and the body or principal of said part shall," etc. All was thus disposed of which might be distributed to stockholders

as incidents of ownership; only the body or principal—plainly the capital represented by the stock and undistributable surplus when the special interest was created—was in contemplation as the *corpus* which should go over to the ownership in remainder.

Why should not the rule be as indicated? Any other would take from the ownership of property in the form of corporate stock freedom to dispose of it as the owner sees fit, as he may any other kind of property. Otherwise in case of the latter the intent of the owner in parting with it would prevail, but in the former the action of third parties, or operation of an arbitrary rule of law having no logical basis, would control. Why is a distribution of surplus assets existing in cash or a distribution in small amounts any different from a distribution of surplus assets in any other form or in large amounts? It is the surplus after charging off liabilities to stock, in either case, which forms the distributable fund. Capital in the true sense is measured by the money value of assets available to balance liabilities to stock. When the net assets are not sufficient for that and have been once sufficient, the capital is said to be impaired. When there is more than enough there is an excess, strictly speaking, a surplus subject to distribution, in the absence of any statutory restraint, to the stockholders. In whatever form the distribution takes it is an income incident of the stock and a depletion of net assets of the corporation, but not a depletion of its capital, strictly so called. True, when the surplus is capitalized and the distribution is made in stock as a dividend to stockholders the corporation has as much assets after the distribution as before, but not as much net assets. The latter are decreased to the same extent if the distribution be in money as if in stock. In one case corporate assets are depleted. In the other corporate liabilities are increased. In each the surplus is depleted and the same in the one case as in the other. If a surplus be created by earnings in the ordinary course of busi-

ness and makes its first appearance in evidence in the form of
cash, but exists in other forms of property at the time of the
distribution, regardless of how carried on the books or the
bookkeeping methods of recording the result of the distribu-
tion, it is a distribution of earnings just the same, not of capi-
tal. The status of capital, strictly speaking, as regards lia-
bility to stock is no different in one case than in the other.
As surplus assets are capitalized by the distribution so the
liabilities are correspondingly increased, and the stockholder
in one case the same as in the other, and to the same extent in
one case as in the other, receives something which he can use
separate and distinct from his previous possession of stock.
In practical effect, a new thing, whether the distribution be
in money or stock. Being such new thing, moving to the
stockholder because of his ownership of stock, why is it not
income and, if out of accumulations of distributable assets
during a beneficiary term, income out of earnings, so far as
the stockholder for such term is concerned, regardless of the
form of the new thing or the manner in which it reaches the
stockholder, or that of the bookkeeping feature in the office of
the corporation?

It is curious to observe that the federal court discovered a
vital distinction between a stock and cash distribution because
in the former the assets of the corporation remain the same,
overlooking the fact that the net assets do not remain the
same, and confusing, as it seems, the term "capital," strictly
so called, the net which makes up the equivalent of stock lia-
bilities, with capital in the broader sense which includes the
net property in the whole—did that, relying on the logic in
*Williams v. W. U. Tel. Co.* 93 N. Y. 162, indulged in there
merely to demonstrate that capital, strictly so called, is the
equivalent of existing stock and all excess is surplus and sub-
ject to be distributed in the form of a stock dividend if de-
sired; which was repeated in *McLouth v. Hunt,* 154 N. Y.
179, 48 N. E. 548, and *Lowry v. Farmers' L. & T. Co.* 172

N. Y. 137, 64 N. E. 796, to demonstrate that the distribution by the stock method, if of earnings of any kind during the term is a distribution of income in the strict sense; that the new stock represents income and is income so far as the corporation is concerned, in that it is produced from income. For the greater reason, so far as the stockholder is concerned, it is income because of its coming to the stockholder as a separable incident of the stock. Such is the case, logically, and such it is recognized by our legislative scheme, as before indicated, sanctioning in case of income which has taken the form of property other than money and is carried on the books as surplus, distribution thereof as in this case.

Notwithstanding a few jurisdictions differ with the foregoing it seems that the conclusion is based on irresistible logic. The authorities supporting it, as well might be expected, are so numerous, easily found, and so familiar that we will not prolong the opinion by further citations. The opposite view, when followed back to its source, will be found not to have been logically deduced and based on principle, but to be a mere arbitrary rule; framed largely, it would seem, for convenience of administration regardless of the liberty and inviolability of private contract rights.

The fact that the dividend stock in this case was in the form of preferred stock cannot make any difference so long as the transaction was in good faith with no intent to take advantage of the owner in remainder. Preferred stock may be issued as freely as common stock, when authorized by the stockholders. No distinction exists. As dividends can be made out of surplus assets however created, so the same may be distributed by dividends as legitimately in the form of stock as in that of money and in the form of preferred stock as in that of common stock.

The foregoing accords with the conclusion of the trial court. In reaching it we have not found it necessary to refer to anything said in *Pabst v. Goodrich*, 133 Wis. 43, 69, 113

N. W. 398. The dividend under consideration there was regarded by the court as made, substantially, out of accumulations prior to creation of the beneficial term. Therefore, the question, vital now, was not involved and the court for that reason expressly declined to treat the subject.

We do not overlook the fact that this was said, in the former opinion, referring to a dividend made some time after the death of Mr. Pabst: "The contention is that . . . at least so much of the amount represented by the dividend as represented the profits earned . . . after the death of the testator should be so paid;" meaning paid to the term tenant. That by itself, suggests that some part of the dividend, in fact, represented profits earned after creation of the trust. The dividend was declared out of stock bought in by the company out of accumulations, leaving still a surplus over and above the entire liabilities to stock, including treasury stock; indicating that the stock might have been purchased with distributable surplus. So far as surplus accumulated after the creation of the trust was in fact so distributed, the part represented by the particular stock should logically have gone to the owner of the special interest therein. The trial court there seems to have held that any increase of assets from earnings, forming part of the surplus, and not existing in money, was not distributable by dividend payments as income, but was distributable, if as dividends at all, as capital. It may be difficult to reconcile the decision now made with all said in that case, or all the inferences that might be drawn therefrom. But it is not considered the court intended to decide that a dividend cannot be declared which, as between a term owner of stock and an owner in remainder, would go to the former unless declared out of income existing in cash,—that a stock dividend as between two such ownerships goes any different than a cash dividend. The idea was that the surplus out of which the stock dividend was paid was substantially accumulated before creation of the two interests and that such small part as

was not so accumulated, if any, was not separable by the find-ings or any definite evidence in the record, and so could only be treated as so accumulated. It was not then supposed di-rectors could make surplus distributable as income or as capi-tal, as between the two interests, according to the manner of distribution, and regardless of the testator's purpose; or that assets from surplus was treatable, as between such two inter-ests, differently according to their character. The case should be read as merely deciding that a dividend made as a means of distributing among stockholders surplus accumulated be-fore the creation of the two interests in the stock, as regards such stock, went to the owner in remainder.

*By the Court.*—Judgment affirmed.

TIMLIN, J. (*dissenting*). Frederick Pabst of Milwaukee died January 1, 1904, leaving a will which was admitted to probate in the county court of Milwaukee county February 3, 1904. He also made a deed bearing date July 17, 1903. By these two instruments he disposed of his property, consist-ing largely of shares of stock in the Pabst Brewing Company, a Wisconsin corporation, in trust upon several distinct trusts. Mr. Pabst left surviving him Maria Pabst, his widow, his sons Gustave G. Pabst and Frederick Pabst, Jr., his daugh-ters Maria Goodrich and *Emma Soehnlein*, and his grand-daughter Emma Maria Pabst, commonly called Elsbeth Pabst. All of these are still living except the testator's widow, who died October 3, 1906. The will was construed in *Pabst v. Goodrich*, 133 Wis. 43, 113 N. W. 398, where the trust provisions of the will may be found in detail. The trusts for the benefit of Gustave G. Pabst, Maria Goodrich, and Frederick Pabst, Jr., have been executed upon the death of testator's widow. Two trusts remain, one for Emma Maria Pabst, not involved in this appeal, and one arising un-der the deed and will called the Soehnlein trust. By the terms of this latter trust *Mrs. Soehnlein* is entitled to the divi-

dends or income of certain shares of stock in the Pabst Brewing Company and contingently entitled to the shares themselves, and the appellants, children of *Mrs. Soehnlein,* subject to the right of the latter to the dividends and income, are contingently entitled to the shares.    In other words, they are contingently entitled to the *corpus* of the trust property.    The present interest of *Mrs. Soehnlein* is only that of a term tenant owning the income or dividends.    The circuit court nevertheless, upon request of the trustee for further instructions, ordered all the proceeds of the sale of that part of the stock dividend apportioned to the Soehnlein trust and hereinafter referred to paid over to *Mrs. Soehnlein.*    Her children appeal and thus raise the question whether or not such proceeds belong in whole or in part to the term tenant or whether these proceeds belong in whole or in part to those who own the *corpus* of the trust property, to wit, the shares.    The premises upon which this question must be determined are as follows: The Wisconsin Trust Company, trustee, together with the executors under the will, applied to the circuit court for instructions in regard to their power and duty to consent to and aid in carrying out the following scheme: The Pabst Brewing Company, a Wisconsin corporation, had a capital of $10,000,000, fully paid, represented by 10,000 shares of the face value of $1,000 each.    It had a surplus of $3,086,562.02, of which $708,894.12 had been by it invested in the purchase of 736 shares of its own stock.    Four hundred and fifty of these shares, called the Falk stock, had been purchased for $454,000 three days before the first application for instructions was filed in the circuit court.    That court thereupon instructed the trustees and executors to consent by vote to amend the articles of incorporation of this company so as to make the par value of all shares $100 each and increase the number of shares accordingly, and to increase the capital stock of the company from $10,000,000 to $12,000,000 by the issue of $2,000,000 preferred stock.    This latter stock was preferred

as to assets as well as to dividends and carried seven per cent. cumulative dividends and was redeemable at $115 per share and accrued dividends.   Out of the 736 shares above mentioned purchased in as aforesaid (which were now 7,360 shares), 5,000 shares were to be given as a bonus to the purchasers of the preferred stock at the rate of one of these shares to each four shares of the preferred stock.   Arrangements were made by which the preferred stock and this 5,000 shares of common stock would, as soon as issued to the existing stockholders, including the trustee, be sold, the preferred stock at par with the bonus of 5,000 shares of common stock prorated as aforesaid to the purchasers of preferred stock.   This was done, and after the money was realized on the shares of the preferred stock which were apportioned to the trustee in the Soehnlein trust according to the usual mode of distributing among existing stockholders, the question brought before this court on this appeal arose, and it was sought to have it ascertained and settled whether these proceeds should go in whole or in part to the owner of the income, viz. the term tenant, or to the owners of the shares which formed the *corpus* of the Soehnlein trust.   By this financiering the corporation would receive for its preferred stock $2,000,000, on which it must pay dividends at the rate of seven per cent. annually, and for the money so obtained at this high rate it must pay out the bonus shares of the value of $500,000 and the premium of $15 per share on redemption of 20,000 shares of preferred stock, amounting to $300,000, thus making the transaction, in its effect upon the stock as it existed prior to the increase, equivalent to borrowing $2,000,000 at seven per cent. per annum and paying for such loan in addition a bonus of $800,000.   The total assets of the corporation at this time amounted to $17,749,487.37, of which amount about $12,000,000 was in buildings, real estate, and tangible personal property other than merchandise, and the remainder mostly in merchandise on hand, bills and accounts receivable,

and its own shares purchased by the corporation.    There was only the sum of $143,196.10 in cash on hand and at the bank. There were liabilities, exclusive of liability to capital stock and surplus, of $4,955,949.51, and in this last was included outstanding bonds secured by mortgage on the corporation's real estate amounting to $2,560,000.    The only evidence tending to show the value of the shares as they stood prior to the issue of preferred stock consists of the amount paid by the corporation for its shares when purchased in from the stockholders as follows:

| | |
|---|---:|
| December 29, 1906, 35 shares | $35,000 00 |
| December 29, 1906, 25 shares | 25,000 00 |
| February 12, 1907, 70 shares | 72,651 63 |
| February 28, 1910, 2 shares | 2,000 00 |
| March 31, 1910, 150 shares | 120,242 49 |
| June 3, 1910, 450 shares | 454,000 00 |

This indicates a value of about par and a dividend rate of five per cent. or less.    There is no direct evidence to show what annual dividends were paid on these shares.    The net result of the transaction, so far as the original shareholders of the Brewing Company were concerned, was to diminish the value of the former stock in the corporation by reducing it to the rank of common stock, by placing a lien of $2,000,000 and $300,000 premium, making $2,300,000, paramount to the common stock in ownership of corporate assets, and by diminishing the ability of the corporation to pay dividends because of the high rate of the preferred cumulative dividends which attached to this preferred stock.    This preferred stock dividend was manifestly much higher than the dividend rate formerly paid by the corporation on its stock.    So far as the corporation is concerned, its liability to surplus was reduced $2,500,000 and its liability to capital increased $2,000,000 by the transaction, and its assets in no wise increased.    So far as the former shareholders are concerned, one who formerly owned $1,000,000 face value of the stock, or one tenth of the corporate assets, now only owns one twelfth of the corporate

assets, subject to the burden of this preferred stock, and in like proportion for smaller amounts. It appears clearly to me that by this transaction the amount and value of the interest of each of the former shareholders is diminished or taken away to a greater extent than it would have been by the mere declaration and payment of a cash dividend out of the surplus, and that the value so taken away is given to the holders of this preferred stock. Sec. 1765, Stats. (1898), is the authority for a corporation issuing a stock dividend. That provides:

"Any corporation (1) *which has invested or may invest its net earnings or income or any part thereof in permanent additions to its property* or (2) *whose property shall have increased in value,* may lawfully declare a dividend payable to stockholders upon its capital either in money or in stock to the extent of the net earnings or income *so invested* or of the *said increase* in the value of its property."

Under this statute as I understand it, a stock dividend is the capitalization of earnings or income which the corporation has already invested in permanent additions to its property or an issue of stock to represent an increase in the value of its property. This last is of course capital. Whether the first is or is not need not be determined here, because, even upon the assumption that it is not, the judgment appealed from is erroneous, as hereinafter attempted to be explained. Sec. 1759a, Stats. (1898), as amended by ch. 576, Laws of 1907, also provides:

"Any corporation may provide for preferred stock in its original articles of organization, or by amendment thereto adopted by the *unanimous vote* of the stockholders, and may, in such original articles or by such amendment thereto adopted by the *unanimous vote* of the stockholders, provide for the payment of dividends on such preferred stock out of the profits at a specified rate before dividends are paid upon the common stock; for the accumulation of such dividends; for a preference of such preferred stock, not, however, exceeding the par value thereof, over the common stock in the dis-

tribution of the corporate assets other than profits; for the redemption of such preferred stock, and for denying or restricting the voting power of such preferred stock."

The trustee for infant beneficiaries who consented and the court which authorized such consent to the scheme heretofore outlined and to the amendment of the articles of the Pabst Brewing Company under the last quoted statute in the instant case were quite complaisant. That transaction is not before us for review, because the appeal here is only from the order distributing the proceeds of the sale of this preferred stock wholly to the term tenant. But the transaction is relevant to the question before us, because it shows that the new preferred stock represents not alone surplus or income, but takes materially from the value of the *corpus* of the trust estate. With reference to sec. 1765, *supra,* it seems to me obvious that if our statute be so construed as to permit the issue of a stock dividend of common stock by a corporation against its surplus, consisting of cash or earnings not capitalized, all corporations paying large dividends and whose stock is for that reason worth more than its par value may at will impair the value of the former shares in the hands of a minority of its shareholders by annual stock dividends based on profits. This must be true unless it is assumed that a corporation which is capable of earning, say, twenty-five per cent. on $10,000 capital will continue to earn twenty-five per cent. on all additions to that capital. I think the latter as a rule, or generally, is demonstrably incorrect. It seems also clear that where the dividends belong to another the guardian or trustee of an infant shareholder should not consent to the issue of preferred stock to be paid for at par out of surplus, particularly preferred stock carrying a high dividend rate and a bonus on redemption, if that preferred stock is to be all turned over to the term tenant or life tenant, or if that preferred stock is to be sold and the whole avails of such sale turned over to the term tenant.

I am unable to understand the majority opinion.   The con-
flicting views of courts there discussed relate to questions not
in the instant case, as it seems to me.   It may be that I have
acquired some of the confusion so generally attributed in that
opinion to the supreme court of the United States and other
distinguished courts and jurists.   I do not understand that
there are any cases which grant to the term tenant the whole
avails of the sale of a stock dividend or the whole stock divi-
dend under circumstances such as .exist in this case.   It is
true there is a conflict of authority upon other and different
questions relating to stock dividends as between the owner of
the income, whom we may call the life tenant, and the owner
of the shares, whom we may call the remainderman.   Except-
ing the cases which assume that the intention of the testator or
other creator of the trust was to recognize the power of the
corporation and the usual mode of corporate business and
consequently to give to the person entitled to the income only
that which the corporation should disburse as income and to
the owner of the shares all that which the corporation should
capitalize or treat as capital, the basic concept in all the cases
is to preserve the *corpus* or principal of the trust estate with
its unearned increment or increase in value for the owner of
the shares and to preserve to the life tenant or other person
entitled to the income all that is really earned income.   This
is the principle underlying the decision in *In re Allis's Es-
tate,* 123 Wis. 223, 101 N. W. 365, and indeed underlying all
the cases relied upon in the majority opinion as well as those
herein cited.   But courts in the application of this principle
have not always agreed with reference to what is capital or
principal and what is income.   I think, however, that all
courts agree (1) that there exists a rule by which, upon in-
crease of capital of a corporation by means of a stock dividend
or otherwise, the new shares must be offered to existing
shareholders *pro rata.*   1 Cook, Corp. (6th ed.) § 286.
(2) Where a trustee is such shareholder he has the right under

this rule to take his *pro rata* of the new shares. (3) This right he holds for the owner of the shares, and if there is any profit, value, or advantage in the exercise of this right such profit, value, or advantage belongs to the owner of the shares, not to the owner of the income. This is the rule even in New York courts, whose decisions the majority opinion finds free from confusion and professes to follow (*Robertson v. De Brulatour,* 188 N. Y. 301, 80 N. E. 398, affirming *S. C.* 111 App. Div. 882, 98 N. Y. Supp. 15), and in Kentucky (*Hite's Devisee v. Hite's Ex'r,* 93 Ky. 257, 20 S. W. 778). From this rule the conclusion seems inevitable that a stock dividend based on profits must also be offered to the owner of the shares, and he may pay cash for it, the cash going to the life tenant or owner of the income and the new shares to the former shareholder. It also follows that if the new shares are to be paid for at par either in cash or by a proportionate diminution of the surplus of the corporation and they are worth more than par, the excess value belongs to the owner of the former shares or the remainderman, and not to the owner of the income. The cases are full of suggestions that the substantial nature, not the form, of the transaction should control. This is in line with the cases decided by this court. *In re Allis's Estate, supra; Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398. If the income or earnings represented in the surplus account of the corporation were disbursed in the form of a cash dividend to the term tenant or the owner of the income, could that person use this cash to buy from the corporation the new shares at par? Manifestly not as against the holder of the old or former shares, unless the shares were first offered to the former shareholder and refused by him. The person entitled to the income, therefore, must pay for these shares not at par but at what they are worth not less than par, in order to preserve the former proportion between principal and income. Upon the increase of capital stock of a corporation by the issue of new shares to be paid for in money,

it is very common knowledge that the right to subscribe to these new shares belongs to the owners of the former stock *pro rata*. Vast transactions are carried on in the stock exchanges of the country in the sale of such rights by the former shareholders. It is said in 2 Cook, Corp. (6th ed.) § 559:

"The right to subscribe for new shares at par upon an increase of the capital stock, which is an incident of the ownership of the stock, does not belong as a privilege to the life tenant, but such an increment must be treated as capital, and be added to the trust fund for the benefit of the remainderman. This is equally the rule whether the trustee subscribes for the new stock for the benefit of the trust or sells the right to subscribe for a valuable consideration. In either event the increase goes to the *corpus*," citing many cases.

This rule is slightly complicated when the increase of capital is paid for out of the surplus or by a proportionate diminution of the surplus. But it is not abrogated. If the surplus so to be applied existed wholly in cash and was of such an amount that the smaller fraction of the corporate assets, which after the increase belonged to the former stockholder, was equivalent in amount and value to the larger fraction thereof which was his before the increase, and no statute like ours intervened, there might be no substantial wrong except the loss of control done to the prior shareholder by giving the new shares to the owner of the income or term tenant; as, for example, if a corporate capital was $1,000,000, consisting of 10,000 shares of $100 each and worth $100 each, and was increased $200,000 and such increase evidenced by a stock dividend payable out of the surplus, the former stockholder who was not the owner of dividends or profits who owned 1,000 shares or one tenth of the corporate property would own property to the amount of $100,000. After the increase he would own, instead of one tenth of $1,000,000, one twelfth of $1,200,000, or $100,000, the same as before. But if the additional 2,000 shares are not identical with the former shares as to privileges, advantages, and value, the original proportion of value be-

tween capital and income cannot continue. If, like the in-
stant case, the 2,000 shares added were preferred stock with
a fixed cumulative dividend larger than that which would be
ordinarily paid on all the stock, thus tending to reduce the
future dividend earning power of the common stock, and were
a prior lien on the assets and payable with a premium, all
these advantages given to the additional or increased stock di-
minished the value of the former stock in the same proportion
as the new stock is enhanced in value by the possession of
these advantages. They come out of the *corpus* of the trust
estate. As it is said in *Eisner's Appeal,* 175 Pa. St. 143, 34
Atl. 577, "The gain of the new stockholder is the precise
measure of loss of intrinsic value of the capital of the old
stockholder." See, also, *Gibbons v. Mahon,* 136 U. S. 549,
10 Sup. Ct. 1057; *Gilkey v. Paine,* 80 Me. 319, 14 Atl. 205;
*Spooner v. Phillips,* 62 Conn. 62, 24 Atl. 524; *DeKoven v.
Alsop,* 205 Ill. 309; *Carter v. Crehore,* 12 Hawaii, 309;
*Moss's Appeal,* 83 Pa. St. 264; *Connolly's Estate,* 198 Pa. St.
137, 47 Atl. 1125; *In re Allis's Estate,* 123 Wis. 223, 101 N.
W. 365; *Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398.

This advantage to the holder of the new stock and conse-
quent diminution of the value of the former stock may result
either because the former stock, by reason of its dividend-pay-
ing power, is worth much more than par, while the new stock of
the stock dividend is issued at par and prorates with the more
costly stock. This is the ordinary case, often adjudicated.
Or it may be because the new stock is given by the amendment
to the articles advantages in priority of lien, in amount or rate
of dividend, in premium on redemption, or otherwise, which
makes it of greater value than the old stock with which it in
all other respects prorates. This is the instant case. One
cannot create value by issuing stock, and the value given to
the new stock by priority of lien or preference as to dividends
or rate of dividends or premium must come out of the former
stock, because there is only one amount of property out of

which both must be fulfilled or satisfied. I conclude, therefore, that the court ·below erred in awarding the whole proceeds of the sale of this preferred stock dividend to the term tenant. Whether any part of the proceeds of the sale of this· preferred stock dividend should go to the term tenant, and if so what proportion, it is unnecessary to consider. The evidence offered below is insufficient to make this point clear,. but it seems to me that there was manifest error in requiring the whole to be paid to the term tenant.

I hope it will not be understood that I approve the majority opinion except as here mentioned. I think I find much confusion and error therein, but such criticism would be unprofitable.

