MILLER, Trustee, Respondent, vs. PAYNE, Appellant, and others, Respondents.
SAME, Respondent, vs. CAMERON and another, Appellants, and PAYNE, Respondent.

*May 17—October 8, 1912.*

*Wills: Construction: Income undisposed of: Estates, when vest: Trusts and trustees: Income and corpus of estate distinguished: Assessments and dividends on corporate stocks: Profits from various sources: Rights of life tenant and remainderman: Compensation of trustee, by whom paid.*

1. Where a will provides for the payment of certain specific annuities during the period of settlement of the estate, but makes no disposition of the balance of the income, such balance should be added to the *corpus* of the estate.
2. Where a will devises the residue of the estate to trustees to hold for a certain term and pay over the income as specified to the widow and sister of the testator, then to make a partial distribution of the *corpus*, one half to the widow and one fourth to the sister, and to retain the remaining one fourth during the lifetime of the widow, paying the income to her, and at her death to assign the principal to the sister if she should survive the widow, otherwise to the sister's son, it is *held*, in the absence of any language in the will evidencing an intention to postpone or delay the vesting of the estate in such *cestuis que trustent*, that it must be regarded as vesting at the time of the death of the testator.
3. In such case, the element of time was not annexed to the devise itself, as a condition precedent thereto, but merely to the time of assignment thereof.

4. Part of the estate consisting of bank stock, and the executor dur-
ing the period of administration having paid a large assess-
ment thereon to make up a defalcation by the president of the
bank, such payment was properly chargeable to the *corpus* and
not to income or, in other words, to the life tenant. It was
not, therefore, necessary to reimburse the estate the amount of
such payment out of earnings before dividends on the stock
could be paid to the life tenant.

5. During the existence of the trust a fifty per cent. dividend was
declared on stock of a realty company which had been formed
by the testator and others to assist a bank in which he was
interested by taking over a tract of land which the bank had
acquired, the purpose of the incorporators being to improve the
property, hold it until it could be disposed of to advantage, and
then sell it and divide the proceeds. The dividend was de-
clared and paid out of the proceeds of the sale of part of such
real estate and was the only dividend the company had ever
paid. *Held*, that such dividend was a part of the *corpus* of the
trust estate, and the life tenant was not entitled thereto.

6. Had the corporation which declared such dividend been engaged
in trading in real estate, the profit accruing to it from an en-
hancement in value of the real estate, as well as from rents
and profits, would be income, but the corporation in question
was not such trading corporation.

7. The fact that such corporation may have had on hand a surplus
of rents and profits from which a dividend might be declared,
does not affect the question as to the character of the dividend
actually declared from the proceeds of sales.

8. The fact that a dividend declared on bank stock held in trust
was charged against a fund designated as undivided profits is
not conclusive, as between the life tenant and the remainder-
man, on the question whether it was a dividend or a part of
the *corpus*.

9. The presumption is that a dividend declared on corporate stock
is declared out of income, and as between the life tenant and
remainderman the burden rests upon the latter to prove it was
not.

10. Where all the stockholders in a bank in which testator held
stock, including the trustees under his will acting with the
consent of the beneficiaries, appropriated a dividend on such
bank stock, earned and declared after testator's death, to the
purchase of a trust company which became an ancillary in-
stitution to the bank, the stock of such trust company must be
regarded as income and belongs to the life tenant and not to the
remainderman.

11. In a controversy between life tenant and remainderman as to what is "income" from corporate stock, recoveries made on assets previously charged to profit and loss account belong to the *corpus.*

12. Where new bank stock was issued and sold at 170 per cent., and of the premium 53.5 per cent. went to make the book value of the new stock equal the old, the remainder of such premium represented a net profit to be distributed ratably between old and new stock.

13. Profits realized by a bank from the sale of land purchased from a bankrupt estate are not to be regarded as an enhancement of the capital of the bank, but as ordinary profits, and as such belong to the life tenant.

14. A dividend substantially earned at the time of the purchase of bank stock by a testamentary trustee, and declared shortly thereafter, belongs to the principal of the trust estate and not to income.

15. Where a *bona fide* controversy existed between the life tenant and remainderman under a testamentary trust, as to what constituted income and what belonged to the *corpus* of the trust estate, the value of services performed by the trustee in preparing data necessary to the judicial determination of that question was properly charged equally to both parties.

APPEALS from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Modified and affirmed.*

Henry C. Payne, late of Milwaukee, Wisconsin, died testate on the 4th day of October, 1904. The defendant *Lydia W. Payne* is the widow of the deceased, the defendant *Imogene P. Cameron* is his sister, and the defendant *Winfield H. Cameron* is the son of said *Imogene P. Cameron.* The last will and testament of said Henry C. Payne was admitted to probate in the county court of Milwaukee county on the 11th day of October, 1904, and letters testamentary issued to *George P. Miller* and Frank G. Bigelow as executors. The material portions of the will and codicil are as follows:

"Sixth. I direct my executors from the date of my decease to pay, during the settlement of my estate, to my wife, *Lydia W. Payne,* an income at the rate of $7,500 per annum, and

during the same period to my sister, *Mrs. Imogene P. Cameron,* of Jamestown, New York, an income at the rate of $1,000 per annum. . . ."

"Eighth. After the payment of the annuities aforesaid and the payment of the other sums as aforesaid, and after the payment of the expenses of the administration of my estate, I give, devise and bequeath all the rest, residue and remainder of my estate, both real, personal and mixed, to my friends Frank G. Bigelow and *George P. Miller,* of Milwaukee, Wisconsin, and to their successors in trust, but in trust only and for the uses and purposes as follows:

. . . . . . . . . . . .

"(4) Until the division of my estate as hereinafter provided in paragraph seven (7), to pay annuities as follows: To my wife, *Lydia W. Payne,* $7,500 per annum; to my sister *Mrs. Imogene P. Cameron,* $1,000 per annum. . . .

"(5) If, after payment of said annuities and the expenses of said trust, and interest and taxes, there remain in any year any net income, such net income shall be paid by said trustees, seventy-five per cent. thereof to my said wife and twenty-five per cent. to my said sister.

"(6) I hereby authorize my trustees, their survivor and their successors in trust to invest, and reinvest, in personal property or real estate, any money which shall come into their hands as trustees, and to manage my estate, and all the property, real, personal and mixed, of said estate, in such a way as in their opinion will result to the best interest of the trust, and to that end I hereby authorize and empower said trustees and their survivor and successors in trust, to sell any part or portion of said property, whether real, personal or mixed, at public or private sale, for cash or on credit, as they may think best, and to convert and reconvert real estate into personal property and personal property into real estate, but they are not required to sell any unproductive portion of the estate unless in their opinion it should be deemed best, nor are they required to sell any portion of said estate unless it be necessary to provide the money necessary to pay the annuities or the said monument upon my said lot at Forest Home cemetery. I also authorize my said trustees, and their survivor and their successors in trust, to borrow money for the purposes of the trust, and to secure the repayment of the same

with interest; to pledge or mortgage any portion of said estate and to execute, acknowledge and deliver the proper instruments in writing.

"(7) At the expiration of three years from the settlement of my estate, I direct my said trustees, and their survivor or their successor in trust, to convey and assign to my said wife, should she be living, fifty per cent. of said estate then in their hands, or, in case of her death, to such persons as may be entitled to the same under her will. At the expiration of three years from the settlement of my estate, to convey and assign to my said sister twenty-five per cent. . . .

"(8) My trustees, after such division, are directed to hold the residue of said estate then in their hands and to pay the net income thereof to my wife so long as she may live, and upon her death to pay the whole or principal thereof to my sister, *Mrs. Imogene P. Cameron,* should she survive my said wife, otherwise to her son, *Winfield Henry Cameron.* . . .

"(9) Should she survive me, and should she leave a last will and testament making disposition thereof, I authorize my wife to dispose of her interest in said fifty per cent. of my estate in any way she may desire, and I direct that said division of my estate as provided for in paragraph numbered '7' and '8' shall be made upon the death of my wife, should she die before the expiration of three years from the settlement of my estate." . . .

The only provision in the codicil material to the present inquiry is contained in paragraph 4 thereof, which reads as follows:

"It is my further will and wish that the settlement of my estate shall be reached and concluded within five years from the date of my decease, unless it shall be the wish of my wife and of my said sister, that the estate shall remain unsettled for a longer period of time. I make this further provision for the purpose of designating a limit to the time in which I deem it advisable that my estate shall remain in the hands of trustees, but it is not intended to further limit or modify the provisions of my last will and testament heretofore made."

On the 5th day of February, 1906, *George P. Miller,* being then the sole executor of the estate of Henry C. Payne, de-

ceased, filed his final account of his administration of said
estate as executor and a final decree was entered in said estate
assigning the residue thereof to *George P. Miller* as trustee,
and letters of trust thereupon issued to said *George P. Miller*
as trustee under the terms of the last will and testament of
said Henry C. Payne, deceased. Thereafter, in December,
1909, plaintiff, as such trustee, made a partial distribution
of the trust estate in his possession, which said distribution
was consented to by the above named defendants and was
ratified and confirmed by an order of the county court of Mil-
waukee county dated and entered the 30th day of December,
1909. On such partial distribution the estate was divided
*in specie,* one half to the defendant *Lydia W. Payne,* one
quarter to the defendant *Imogene P. Cameron,* and plaintiff,
as such trustee, retained one quarter thereof.

At his death Henry C. Payne owned 400 shares of the
capital stock of the St. Paul Avenue Improvement Company
of the par value of $100 each, appraised by the county court
appraisers as being worth $80 per share, fifty shares of the
capital stock of the National Surety Company of the par
value of $100 each, appraised by the county court appraisers
as being worth $140 per share, and 1,000 shares of stock of
the First National Bank of Milwaukee of the par value of
$100 each, appraised by the county court appraisers as being
worth $100 per share. The appraisal of the value of the
stock of said First National Bank of Milwaukee was an ap-
praisal of its market value subsequent to the defalcation of
Frank G. Bigelow and prior to the payment into said First
National Bank of Milwaukee of the assessment of sixty-six
and two-thirds per cent. levied upon all of the stock of said
bank to make good such defalcation.

During his administration as executor, *George P. Miller,*
as such executor, purchased fifty shares of the capital stock
of the St. Paul Avenue Improvement Company of the par
value of $100 each, paying therefor the sum of $3,897.60,

all of which was consented to by the defendants herein. *George P. Miller,* as executor, also paid to the First National Bank of Milwaukee $66,666.67 as and for an assessment made upon the 1,000 shares of the capital stock of said bank belonging to the estate of Henry C. Payne, deceased, which said assessment of sixty-six and two-thirds per cent. was levied by the stockholders of said bank upon all of the stock of said First National Bank of Milwaukee in order to make up the amount by which the capital of said bank had been impaired through the defalcation of one Frank G. Bigelow; said payment was made by said *George P. Miller* as executor out of the *corpus* of the estate in his hands and was in his account charged against such *corpus.* In about the month of March, 1909, plaintiff, then acting as trustee, received a stock dividend of fifty per cent. on the stock of the National Surety Company, owned by him as such trustee, which stock dividend amounted to twenty-five shares of the capital stock of the National Surety Company. The amount of said stock dividend was charged by the National Surety Company against surplus and was received by plaintiff and by him credited to income of the trust estate in his hands, but said twenty-five shares of stock was immediately by plaintiff, as trustee, transferred at its par value from income to principal account of said estate to pay an indebtedness of income account to the principal account of said estate, and was thereafter treated by him as a part of the principal of said trust estate, all of which was consented to by the defendants.

The 400 shares of the capital stock of the St. Paul Avenue Improvement Company owned by Henry C. Payne at his death, together with fifty additional shares purchased by said executor, as aforesaid, were transferred by said executor to plaintiff as trustee at the time of the entry of the final decree on the 5th day of February, 1906, and said fifty shares of stock of the National Surety Company, thereafter increased by twenty-five shares as aforesaid, and the 1,000

shares of stock of the First National Bank of Milwaukee
owned by said Henry C. Payne at his death, were likewise so
transferred to plaintiff as trustee. Upon the partial distribu-
tion of said estate by the plaintiff as trustee on the 30th day
of December, 1909, plaintiff as such trustee retained as a part
of the trust estate to be further administered by him, 119
shares of the capital stock of the St. Paul Avenue Improve-
ment Company, 250 shares of the stock of the First National
Bank of Milwaukee, and nineteen shares of the stock of the
National Surety Company, said amounts so retained being
one quarter of the number of shares of each stock respect-
ively owned by Henry C. Payne at his death, plus one quarter
of the number of shares of each stock acquired subsequent to
the death of Henry C. Payne, as hereinbefore stated.

The shares of stock last described, constituting the one
quarter of the estate retained by plaintiff as trustee upon the
partial distribution of the estate, are held upon the trusts set
forth in paragraph numbered 8 of testator's will.

In or about the month of January, 1911, plaintiff as trustee
received from the St. Paul Avenue Improvement Company
the sum of $5,650 in cash, the same being a dividend of fifty
per cent. on the capital stock of said St. Paul Avenue Im-
provement Company standing in the name of said *George P.
Miller* as trustee. At or about the same time the said *George
P. Miller,* as such trustee, received from the National Surety
Company a stock dividend of six and one-third shares of the
capital stock of said company of the par value of $100 each,
the same being a stock dividend of thirty-three and one-third
per cent. on the capital stock of said National Surety Com-
pany standing in the name of said *George P. Miller* as
trustee.

In February, 1911, the First National Bank of Milwaukee
declared a dividend of $532,617.12, the proceeds of which,
pursuant to an agreement among the stockholders of the bank,
were used to purchase the stock of the First Savings & Trust

Company, upon certain terms and conditions found by the trial court, but not necessary to be here stated.

The St. Paul Avenue Improvement Company was incorporated in 1899 with an authorized capital of $100,000 and with the purposes expressed in its articles of incorporation as follows: "For the purpose of buying and selling real property, improving and leasing the same, and doing of all other things which pertain to business of like nature."

Henry C. Payne, Charles Pfister, Fred Vogel, Jr., and Frank G. Bigelow each subscribed for one fifth of the capital stock. Ephraim Mariner and John W. Mariner each subscribed for one tenth of the capital stock. The original subscribers, except John W. Mariner, were directors of the First National Bank of Milwaukee, and in an effort to help said bank out of a difficulty had taken over the bank's interest in certain lands situated on or adjacent to St. Paul avenue in the city of Milwaukee, which interest had been acquired by the bank as security for certain loans, and the said incorporators assumed the indebtedness to said bank. The five directors of the bank acquired the interests of all persons in and to said lands at a cost of $393,380.30, including indebtedness assumed, and assumed all of the indebtedness thereon, which amounted to $365,215. It was the intention of said directors to hold said land until a favorable opportunity to sell presented itself. Upon the organization of the St. Paul Avenue Improvement Company the interests in said lands acquired by said five directors of said bank were transferred to said company and said company assumed all the indebtedness. The lands were taken over by the company with the intention of managing them and disposing of them as soon as possible, paying up the indebtedness of the company and dividing the proceeds that remained among the stockholders. In or about the month of February, 1901, said St. Paul Avenue Improvement Company increased its capital stock to $200,000, the original stockholders taking their *pro rata*

shares in such increase, and the capital stock of the St. Paul
Avenue Improvement Company since that time has been and
now is $200,000.   Henry C. Payne paid for all of his shares
of stock in said company at par in cash.   At the time of the
acquisition of the properties by the St. Paul Avenue Im-
provement Company the properties were largely unimproved
and unproductive.   The increase in capital stock of the com-
pany was used prior to the death of Mr. Payne for the pur-
pose of erecting buildings on the properties of the company
and making other permanent improvements.   Since the death
of Mr. Payne no additional lands have been purchased nor
have any buildings been erected on the company's properties,
with the exception of one building at a cost of about $25,000.
Down to the time of the death of Henry C. Payne on Oc-
tober 4, 1904, the carrying charges for the property, includ-
ing interest on the indebtedness, exceeded the income from
the properties except for the years 1903 and 1904, during
which years there was an excess of receipts over carrying
charges of $1,477.73 in 1903 and $434.79 in 1904.   Since
the death of Henry C. Payne and down to the time of the
declaration of the fifty per cent. dividend above referred to,
the net income from said properties from rents, interest, and
dividends on stocks owned amounted to $47,540.65.   At the
time of the death of Henry C. Payne said St. Paul Avenue
Improvement Company had invested in the aggregate in prop-
erties and improvements the sum of $527,139.46, had made
sales of property amounting to $10,075, and had reduced its
indebtedness to the sum of $359,315, and had made net earn-
ings from the properties of $1,803.82.   At the time of the
declaration of said fifty per cent. dividend the St. Paul Ave-
nue Improvement Company had invested in real properties
and improvements the sum of $561,835.11, and in seven per
cent. preferred stock of the Geuder, Paeschke & Frey Com-
pany $23,000.   Its total sales aggregated $616,075, and its
indebtedness had been reduced to about the sum of $50,000.

Immediately after the declaration of said dividend the property assets of the company were of the fair value of $340,000, which included $200,000 of the seven per cent. preferred stock of Geuder, Paeschke & Frey Company worth par, and real estate of the fair value of $140,000. Six hundred and five thousand dollars of its total sales were contracted for and made by the company subsequent to the death of Mr. Payne, and practically all of such sales or the contracts therefor were made by the company prior to the partial distribution of the Henry C. Payne estate on December 30, 1909. The St. Paul Avenue Improvement Company has not carried on its books a separate account for net earnings or a separate account of profits or surplus. The resolution of the board of directors declaring the fifty per cent. dividend was approved at a meeting of the directors held January 4, 1911, and is as follows:

"Mr. Mariner reported that he had closed the deal with the Minneapolis, St. Paul & Sault Ste. Marie Railway and had conveyed to the Terminal Railway Company the lands which this company had previously contracted to convey and that he had received from it $105,318.75 and moved that the board of directors declare a dividend of 50 % upon its capital stock, payable immediately to its stockholders, which motion seconded by Mr. Pfister and unanimously carried."

The money distributed to the stockholders of the St. Paul Avenue Improvement Company as such fifty per cent. dividend were funds received from Milwaukee Terminal Railway Company as the final payment upon its land contract for the purchase of part of the properties of the St. Paul Avenue Improvement Company, which was entered into about December, 1905. At the time of the death of Henry C. Payne, the St. Paul Avenue Improvement Company's assets consisted only of its properties with the improvements thereon. The dividend of fifty per cent. declared by the St. Paul Improvement Company was paid in cash and was the only dividend ever paid upon the stock of that company since its organization.

The dividend received by plaintiff as such trustee from the
National Surety Company, consisting of six and one-third
shares of the capital stock of that company, was declared out
of surplus accumulated from earnings all subsequent to the
death of Henry C. Payne.    On December 30, 1909, the capi-
tal of said National Surety Company was $750,000 and its
surplus $1,004,769.40.    Immediately prior to the declara-
tion of said stock dividend in January, 1911, said National
Surety Company had a capital of $750,000 and a surplus of
$1,163,000.    The total amount of stock dividend declared by
said National Surety Company in January, 1911, amounted
to $250,000.    It was declared out of and charged against the
surplus of that company.    The surplus of said company at
the death of Henry C. Payne amounted to $309,912.27.    The
surplus of said company after the declaration of said stock
dividend amounted to $913,000.    The said stock dividend
so received by plaintiff as such trustee was additional to regu-
lar annual cash dividends on said National Surety Company
stock.

The dividend of $532,617.12 declared by the First Na-
tional Bank of Milwaukee to its stockholders on the 15th day
of May, 1911, was charged against and paid out of the undi-
vided profits of said bank.    At the time of the death of
Henry C. Payne said First National Bank of Milwaukee had
a capital of $1,500,000, a surplus of $500,000, and undivided
profits of $614,309.47, making a book value of approxi-
mately 174.    Thereafter and in April, 1905, occurred the
defalcation of one Frank G. Bigelow, then president of said
bank.    Prior to said defalcation the book value of said stock
was 176.11.    Said defalcation seriously impaired the capital
and surplus of said bank so that just prior to the levying of
the assessment upon the stock of said bank hereinafter re-
ferred to the book value of said stock was 68.85.    Said as-
sessment of sixty-six and two-thirds per cent. on the capital
stock of said bank was paid in by all the stockholders prior

to December 1, 1905. In December, 1905, the capital stock of said bank was increased to $2,000,000 by the sale of $500,000 par value of new stock at 166⅔, , the proceeds of which sale, amounting to $833,333.33, were applied as follows: $500,000 was transferred to capital stock, and the remaining $333,333.33, together with $16,666.67 taken from the then existing undivided profits of the bank, was used to create a new surplus account of $350,000, making the capital and surplus of said bank from that date respectively $2,000,000 and $350,000, and on February 5, 1906, the capital of said bank was $2,000,000, its surplus $350,000, its undivided profits $50,478.08, and its special guaranty fund, which is an undivided profit account, $23,899.82. The trust estate of Henry C. Payne did not subscribe for or purchase any of the shares of stock constituting such increase in the capital stock of said bank in December, 1905. On December 31, 1909, at the time of the partial distribution of the Henry C. Payne estate, the capital of said bank was $2,000,000, the surplus $500,000, undivided profits $311,562.76, and the special guaranty fund $100,000. On May 15, 1911, just before the dividend in dispute was declared, the capital of said bank was $2,500,000, its surplus $500,000, its undivided profits $749,386.50, and its special guaranty fund $171,100.50, and on said 15th day of·May, 1911, after the declaration of said dividend, said bank had a capital stock of $2,500,000, a surplus of $500,000, undivided profits $216,000, and a special guaranty fund of $171,100.50. The increase in undivided profits and guaranty fund of said bank from December 31, 1909, to the declaration of said dividend May 15, 1911, was the sum of $508,924.24: $350,000 of such increase was derived from the sale of new stock at 170 as set forth above. The undivided profits and guaranty fund remaining after such dividend was paid exceeded the amount of $350,000 derived from the premium received on the sale of said stock as aforesaid.

In addition to the above facts stipulated between the parties in the trial court, the parties stipulated in this court that the following facts may be considered in the determination of the appeals:

*As to the St. Paul Avenue Improvement Company:*

The total sales made by the St. Paul Avenue Improvement Company, from the date of its organization down to October 4, 1904, amounted to $10,075; from October 4, 1904, down to February 5, 1906, to $149,000; and between February 5, 1906, and January 4, 1911, to $449,500.   Total, $608,575.   The sale by the company to the Milwaukee Terminal Railway Company is included in the $149,000 of sales from October 4, 1904, to February 5, 1906.   The net earnings of the company from rents, interest, and dividends on stocks owned was for the period from October 4, 1904, to February 5, 1906, $5,131.74, and for the period from February 5, 1906, to January 4, 1911, $42,300.21.

*As to the First National Bank of Milwaukee, Wisconsin:*

1. Gross amount of assets charged to profit and loss between October 4, 1904, and February 5, 1906, both dates inclusive.................... $2,537,659 35
2. Gross amount of subsequent recoveries made out of all items charged to profit and loss on and prior to February 5, 1906:
   (A) Between October 4, 1904, and February 5, 1906, inclusive .......................... 256,651 28
   (B) Between February 5, 1906, and December 31, 1909, inclusive .......................... 238,099 90
   (C) Between January 1, 1910, and May 15, 1911, inclusive ................................ 33,236 76

At the bankrupt sales of Frank G. Bigelow, on whose account much of the charges of assets to profit and loss during the period from October 4, 1904, to February 5, 1906, were made, the bank purchased the interest of Mr. Bigelow in some coal lands in Colorado.   The bank, previous to such purchase, had no interest in or lien on these lands or on Mr. Bigelow's interest therein.   The purchase was made because the bank knew they could be secured at a low price and expected to

make a profit on the purchase. The interests were subsequently sold by the bank at a profit and the profit carried into the undivided profits of the bank. The dates of purchase and amounts paid and the dates of sale and the price received for the said lands are as follows:

1. Date of purchase.
    April 4, 1906,—1,600 acres......................... $19,555 56
    May 10, 1907,—40 acres............................     100 00
    June 7, 1907,—160 acres...........................     100 00

        Purchase price............................... $19,755 56
2. Date of sales.
    May 2, 1907,—600 acres............................ $23,916 00
    February 11, 1910,—1,200 acres...................  120,749 61

        Selling price................................ $144,665 61
    Expenses and taxes paid.......................   $3,464 55
        The above lands were bought and carried on
    the books of the First National Bank of Milwau-
    kee as real estate.
3. Statement of capital assets of First National Bank,
    as of February 5, 1906:
    Capital ...................................... $2,000,000 00
    Surplus ......................................   350,000 00
    Undivided profits.............................    53,321 50
4. Dividends declared by bank from October 4, 1904, to
    May 15, 1911:
    December 30, 1904, 2½ % on capital $1,500,000
        (last quarter) ............................  $37,500 00
    Year 1905, 2½ % on capital $1,500,000 (first quar-
        ter) .......................................   37,500 00
    Year 1906, 4 % on capital $2,000,000..............   80,000 00
    Year 1907, 5 % on capital $2,000,000..............  100,000 00
    Year 1908, 6 % on capital $2,000,000..............  120,000 00
    Year 1909, 7 % on capital $2,000,000..............  140,000 00
    Year 1910, 8 % on capital $2,000,000..............  160,000 00
    January 1, 1911, to May 15, 1911, 3 % on capital
        $2,000,000 .................................   60,000 00

The plaintiff above named as trustee has performed services in investigating the facts surrounding the declaration and receipt by him of each of the dividends referred to in his complaint herein and in preparing a complaint and supplemental complaint for the purpose of submitting the questions to the court, and for such services and the necessary attention to be given by him to the entry of the decree of the court the sum of $500 is reasonable compensation. The plaintiff secured

the consent of the defendants *Cameron* to the representation in this action of defendant *Lydia W. Payne* by the firm of which plaintiff is a member.

The trial court entered judgment which, so far as material to the appeals taken, decreed:

First. The dividend received by plaintiff as trustee from the St. Paul Avenue Improvement Company in or about the month of January, 1911, in the sum of $5,650 is and should be treated as a part of the *corpus* of the trust estate in the hands of plaintiff and should be held and invested by plaintiff as such *corpus,* subject to the provisions of the last will and testament of Henry C. Payne, deceased, and the income from such investment paid to the defendant *Lydia W. Payne* as life tenant of the trusts of which plaintiff is trustee and as the person entitled to the income of said trust estate.

Second. The dividend received by plaintiff as such trustee from the National Surety Company, consisting of six and one-third shares of the capital stock of such company, is income of said trust estate and belongs to the defendant *Lydia W. Payne* as life tenant under the trusts of which plaintiff is trustee and as the person entitled to receive the income from said trust estate.

Third. That plaintiff, as such trustee, pay over and transfer to said defendant *Lydia W. Payne* the said six and one-third shares of the capital stock of the National Surety Company received by him as such dividend as aforesaid, or the proceeds thereof, together with all income therefrom or interest thereon received by plaintiff subsequent to the receipt of said six and one-third shares of stock.

.   .   .   .   .   .   .   .   .   .   .   .   .

Fifth. The dividend declared by the First National Bank of Milwaukee on or about May 15, 1911, upon the $312\frac{1}{2}$ shares of the capital stock of said First National Bank of Milwaukee, owned by plaintiff as such trustee, and used and disposed of in accordance with the terms of the indenture

dated February 25, 1911, by and between Fred Vogel, Jr., William Bigelow, and Fred T. Goll, as trustees, parties of the first part, and the stockholders of the First National Bank of Milwaukee, parties of the second part, is income of said trust estate. The *corpus* of said estate has been enriched by the amount of said dividend, and the said *corpus* of said estate is indebted to the income account of said estate in the amount of said dividend, as of the 15th day of May, 1911.

Sixth. That the plaintiff as such trustee pay to defendant *Lydia W. Payne* an amount equal to $\frac{3125}{250000}$ of the value of all the capital stock of the First Savings & Trust Company of Milwaukee, Wisconsin, owned and held by Fred Vogel, Jr., William Bigelow, and Fred T. Goll as trustees under the aforesaid agreement of February 25, 1911, and that said amount so paid to defendant *Lydia W. Payne* be by plaintiff as such trustee paid out of and charged against the *corpus* of said trust estate in his hands.

. . . . . . . . . . . . . .

Eighth. The plaintiff as such trustee is entitled to compensation for services in connection with this action to the amount of $500, together with his costs and disbursements in this action, and that the amount of such compensation and his costs and disbursements shall be paid out of the trust estate and charged one half to the income account of said trust estate and one half to the principal account thereof.

The defendants *Imogene P. Cameron* and *Winfield H. Cameron* appealed from that part of the judgment contained in paragraphs numbered 2, 3, 5, and 6, and from so much of the judgment contained in paragraph 8 as decrees that one half of the sum allowed to the plaintiff for his costs and disbursements be charged to the principal account of the trust estate.

The defendant *Lydia W. Payne* appealed from that part of the judgment contained in paragraph numbered 1.

For the defendants *Imogene P. Cameron* and *Winfield H. Cameron* there were briefs by *Bloodgood, Kemper & Bloodgood,* attorneys, and *Jackson B. Kemper,* of counsel, and oral argument by *Jackson B. Kemper* and *James B. Blake.* They cited 2 Cook, Corp. (6th ed.) secs. 552–554, 559; *Holbrook v. Holbrook,* 74 N. H. 201, 66 Atl. 124; *Hite's Devisees v. Hite's Ex'r,* 93 Ky. 257, 20 S. W. 778, 19 L. R. A. 173; *Kalbach v. Clark,* 133 Iowa, 215, 110 N. W. 559; *Walker v. Walker,* 68 N. H. 407, 39 Atl. 432; *Outcalt v. Appleby,* 36 N. J. Eq. 73; *Van Blarcom v. Dager,* 31 N. J. Eq. 783; *Gray v. Darlington,* 15 Wall. 63; *Robertson v. De Broulatour,* 188 N. Y. 301, 80 N. E. 938; *DeKoven v. Alsop,* 205 Ill. 309, 68 N. E. 930; *Brown v. Brown,* 72 N. J. Eq. 667, 65 Atl. 739; *Atkins v. Albree,* 94 Mass. 359; *Brinley v. Grou,* 50 Conn. 66; *Biddle's Appeal,* 99 Pa. St. 278; *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365; *Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398; *Soehnlein v. Soehnlein,* 146 Wis. 330, 131 N. W. 739; *Lang v. Lang's Ex'r,* 57 N. J. Eq. 325, 41 Atl. 705; *Ballantine v. Young* (N. J. Eq.) 81 Atl. 119; *Oliver's Estate,* 136 Pa. St. 43, 20 Atl. 527; *Thayer v. Burr,* 201 N. Y. 155, 94 N. E. 604; *Ex parte Humbird,* 114 Md. 627, 80 Atl. 209; *Newport T. Co. v. Van Rensselaer,* 32 R. I. 231, 78 Atl. 1009, 35 L. R. A. N. s. 553.

For *Lydia W. Payne* as appellant and respondent there were briefs by *Miller, Mack & Fairchild,* and oral argument by *George P. Miller.* They cited *Soehnlein v. Soehnlein,* 146 Wis. 330, 131 N. W. 739; note *Holbrook v. Holbrook* (74 N. H. 201, 66 Atl. 124) in 12 L. R. A. N. s. 768–816; *Read v. Head,* 6 Allen, 174; *Balch v. Hallet,* 10 Gray, 402; *Thomson's Estate,* 153 Pa. St. 332, 26 Atl. 652, 653; *In re James,* 146 N. Y. 78, 40 N. E. 876; *Oliver's Estate,* 136 Pa. St. 43, 20 Atl. 527; *Plympton v. Boston Dispensary,* 106 Mass. 546; *Williston v. M. S. & N. I. R. Co.* 13 Allen, 400; *Crawford v. N. E. R. Co.* 3 K. & J. 723, 744; 2 Perry, Trusts (6th ed.)

§ 874; *Tubb v. Fowler,* 118 Tenn. 325, 99 S. W. 988; *Board-man v. Boardman,* 78 Conn. 451, 62 Atl. 339; *Eisner's Estate,* 175 Pa. St. 143, 34 Atl. 577.

The following opinion was filed June 4, 1912:

VINJE, J.    The appeal of *Mrs. Cameron* presents these questions: (1) When did the trust estate vest—at the time of the death of the testator or at the time of the partial division of the estate, December 30, 1909? (2) Should *corpus* bear the loss of the Bigelow defalcation? (3) Should the National Surety Company's dividend of $250,000, declared in January, 1911, go to life tenant or remainderman, or partly to both? (4) Was the First National Bank dividend of $532,617.12, declared in May, 1911, in fact a dividend, or did it remain *corpus?* (5) If a dividend, was it derived from profits earned since the trust estate vested? and (6) Should *corpus* pay one half the compensation awarded the trustee? The appeal of *Mrs. Payne* challenges the correctness of the finding that the dividend of the St. Paul Avenue Improvement Company of $100,000 declared in January, 1911, was paid out of *corpus.*

Before taking up these questions in detail it may be well to consider briefly the general scheme of the testator's will. It clearly contemplates three distinct periods of administration of the estate by the executors and trustees: *First,* the period of the settlement of the estate, during which time it is to remain in the hands of the executors. This period was by the codicil limited to five years from the death of the testator, unless his widow and sister should desire it to remain unsettled for a longer period of time. During the period of settlement specific annuities are required to be paid the widow and sister and others, and no provision is made for the disposition of income. It therefore goes to *corpus* during such period. The testator died October 4, 1904, and the estate was settled February 5, 1906, and then assigned to the trustee, *George*

*P. Miller. Second,* the period elapsing between the settlement of the estate and the partial division thereof as required by subdivision 7 of paragraph 8. This period was limited to three years from the time of the settlement of the estate, or to the time of the widow's death should it occur earlier. During this period specific annuities were to be paid the widow and sister and others, and the net income in any one year to be paid seventy-five per cent. to the widow and twenty-five per cent. to the sister. At the end of this period, after the payment of certain specified legacies, one half of the estate was to be assigned to the widow, one quarter to the sister, and one quarter retained by the trustees, and the net income thereof paid to the widow during her life, and upon her death to assign the principal to his sister, should she survive the widow, otherwise to his sister's son, *Winfield H. Cameron.* The partial distribution of the estate took place December 30, 1909. *Third,* the period between the partial distribution of the estate and the death of the widow, during which time the trustees were to hold one quarter of the estate and pay the net income to her.

From the time of the settlement of the estate to the time of the partial distribution thereof all net income received was paid seventy-five per cent. to the widow and twenty-five per cent. to the sister, as directed by the will. Since the estate was divided *in specie* and the division of net income and of estate go to the widow and sister in the proportion of seventy-five per cent. to twenty-five per cent. (including in widow's share the one quarter of the estate held by the trustee for her use), it becomes immaterial to ascertain how much, if any, of the dividends in question were earned prior to the partial distribution of the estate; for after such partial distribution the widow is entitled to the net income of seventy-five per cent. of the estate—the fifty per cent. assigned to her and the twenty-five per cent. held by the trustee,—and the sister is entitled to the income of her twenty-five per cent. of the estate,

which is just in the same proportion in which they shared net income prior to the partial distribution. In other words, the percentage of stock from which they derive income after the partial distribution is just the same as the percentage of income they had from the stock before such distribution.

Aside from specific legacies and annuities mentioned in the will of the testator, the whole estate held by the trustees was to be assigned to the widow and sister, one half to the widow and one quarter to the sister, at the time of the partial distribution, and the other one quarter to the sister upon the death of the widow, should the sister survive, and, if not, to her son, *Winfield H. Cameron*. There is a direct specific devise of the estate to the trustees for the purpose of so disposing of it. Such devise, in the absence of any language in the will evidencing any intention to postpone or delay the time it is to take effect, must be regarded as vesting the estate in the *cestuis que trustent* at the time of the death of the testator. *Patton v. Ludington,* 103 Wis. 629, 79 N. W. 1073; *Matter of Brown,* 154 N. Y. 313, 48 N. E. 537. There is no uncertainty as to who are the *cestuis que trustent*. They are specifically named in the will. Three quarters of the estate was to be assigned directly to them within three years of the settlement of the estate without any intervening estate in any one, and the other quarter was subject only to the life estate of the widow. They were all in being at the time of the death of the testator. The widow had the immediate right to the possession of one half the estate upon the partial distribution thereof. The sister had the immediate right to the possession of one quarter of the estate at the same time, and to the other quarter upon the termination of the life estate of the widow therein. There is nothing in the will to make the persons to whom, or the events upon which, the estates are to take effect, uncertain. Their estates therefore vested at the time of the death of the testator. In *Venner v. Mauer,* 133 Wis. 325, 113 N. W. 663, it was held that "where a will pro-

vides for the payment of interest on a fund to a legatee till a specified time, and then for payment of principal to him, the presumption is, nothing appearing convincingly to the contrary, that the purpose of the testator was that the right to the fund itself should vest in such person at the time of the vesting of the right to the use." Page 335. In the devise of the estate to the widow and sister the element of time was not annexed to the devise itself as a condition precedent thereto, but was annexed merely to the time of the assignment thereof. The devise was absolute, and was to be enjoyed at a fixed time in the future. It therefore vested when the will took effect, namely, at the time of the death of the testator. *Ohse v. Miller,* 137 Wis. 474, 119 N. W. 93.

It appears that during the administration of the estate the executor, *George P. Miller,* paid to the First National Bank of Milwaukee $66,666.67, being the amount assessed upon the 1,000 shares of capital stock of said bank belonging to the estate. An assessment of sixty-six and two-thirds per cent. was levied by the stockholders of said bank upon all the capital stock thereof in order to make up the amount by which the capital of said bank had been impaired through the defalcation of its president, Frank G. Bigelow, who was named as an executor and trustee of the will of Henry C. Payne, but who resigned and left the trust to be executed by the present trustee, *George P. Miller.* The payment was made by the executor out of the *corpus* of the estate in his hands, and was in his account charged against *corpus.* The claim made by the defendant *Mrs. Cameron* is, that no profits declared by the bank should be paid the life tenant until the loss of the defalcation was made good from the earnings thereof. This is but another way of stating that the loss should be borne by the life tenant and not by the remainderman. The executor properly charged the loss to *corpus.* It was the capital of the bank—the *corpus* of the estate—that sustained the loss occasioned by the defalcation. By reason thereof the remain-

derman sustained a loss of $66,666.67 of capital and the life tenant sustained the loss of the income which would otherwise have been paid her out of that sum had it not been lost. It was not therefore necessary to reimburse the estate this amount out of earnings before dividends declared on the stock held by the trustee could be paid to the life tenant.

The St. Paul Avenue Improvement Company was incorporated in 1899 with a capital of $100,000 "for the purpose of buying and selling real property, improving and leasing the same, and doing of all other things which pertain to business of like nature." All the original subscribers, except one, were directors of the First National Bank of Milwaukee, and, for the purpose of helping said bank out of a difficulty, had taken over its interest in certain lands situated on or adjacent to St. Paul avenue in the city of Milwaukee. It was the intention of said directors to hold the lands until a favorable opportunity to sell presented itself. Upon the organization of the St. Paul Avenue Improvement Company the interests in said lands acquired by the directors were transferred to the company and it assumed all the indebtedness. It is stipulated that the lands were taken over by the company with the intention of managing them and disposing of them as soon as possible, paying up the indebtedness of the company, and dividing the proceeds that remained among the stockholders. In February, 1911, the company increased its capital stock to $200,000, the original incorporators taking their *pro rata* shares in such increase of the capital stock. Since that time its capital stock has been and now is $200,000. At the time the properties were acquired by the company they were largely unimproved and unproductive. The increase of the capital stock of the company was used prior to the death of Mr. Payne for the purpose of erecting buildings on the properties and in making other permanent improvements. Since the death of Mr. Payne no additional lands have been purchased nor have any buildings been erected on the company's

properties, with the exception of one building at a cost of $25,000. But since his death and down to the time of the declaration of the fifty per cent. dividend in question, the net income from the properties of the company from rents, interest, and dividends on stocks owned amounted to $47,540.65.

In December, 1905, the company made a contract with the Minneapolis, St. Paul & Sault Ste. Marie Railway Company for the sale of certain lands to it. It appears that the deal was not closed until sometime in January, 1911. January 4, 1911, the board of directors of the St. Paul Avenue Improvement Company passed the following resolution:

"Mr. Mariner reported that he had closed the deal with the Minneapolis, St. Paul & Sault Ste. Marie Railway and had conveyed to the Terminal Railway Company the lands which this company had previously contracted to convey and that he had received from it $105,318.75 and moved that the board of directors declare a dividend of 50 % upon its capital stock, payable immediately to its stockholders, which motion seconded by Mr. Pfister and unanimously carried."

It is further stipulated as a fact between the parties that the money distributed to the stockholders of the St. Paul Avenue Improvement Company as such fifty per cent. dividends were funds received from the Terminal Railway Company as the final payment upon its land contract for the purchase of a part of the properties of the St. Paul Avenue Improvement Company, which was entered into about December, 1905. This dividend of fifty per cent. was paid in cash and was the only dividend ever paid upon the stock of that company since its organization.

It is urged on behalf of *Mrs. Payne* that the St. Paul Avenue Improvement Company was organized for the purpose of dealing in real estate as a commodity, and that as such it had only two sources of profit, one being the net earnings of the company which are produced when the receipts from the properties exceed the carrying charges thereon, and the other, profits from the sales of its properties at figures in excess of

the cost thereof; and that both such sources of profits are to be considered as the earnings of such company. In support of this, reliance is placed upon *Read v. Head,* 6 Allen, 174; *Balch v. Hallet,* 10 Gray, 402; *Oliver's Estate,* 136 Pa. St. 43, 20 Atl. 527; *Thomson's Estate,* 153 Pa. St. 332, 26 Atl. 652, 653; *In re James,* 146 N. Y. 78, 40 N. E. 876.

In behalf of *Mrs. Cameron* it is claimed that while the articles of incorporation authorized the St. Paul Avenue Improvement Company to buy, sell, improve, and lease real estate of all kinds, yet it was not in fact a trading corporation in real estate; that it took these lands for the purpose of disposing of the same as soon as practicable and at such an advance in price as it might be able to obtain; and that the moneys received from the railway company for these lands represented simply an enhancement of the value of the *corpus* of the capital of the company, and not earnings in the true and ordinary sense of that term.

We deem the latter claim well taken. Any dividend derived from a mere enhancement of the value of assets representing capital from sources other than the accumulation of earnings belongs to the remainderman and not to the life tenant. It represents *corpus,* not income. *Kalbach v. Clark,* 133 Iowa, 215, 110 N. W. 599, 12 L. R. A. N. s. 801; *Holbrook v. Holbrook,* 74 N. H. 201, 66 Atl. 124, 12 L. R. A. N. s. 768; *Hite's Devisees v. Hite,* 93 Ky. 257, 20 S. W. 778, 19 L. R. A. 173; *Outcalt v. Appleby,* 36 N. J. Eq. 73; *Gray v. Darlington,* 15 Wall. 63; *Eisner's Estate,* 175 Pa. St. 143, 34 Atl. 577. To this rule there is a well known exception in the case of a corporation engaged in buying and selling real estate at a profit, and if the St. Paul Avenue Improvement Company could be considered a trading corporation in real estate within the meaning of the exception to the rule stated, the profits accruing to the corporation, whether derived from an enhancement in the value of real estate or from rents and profits in excess of cost of maintenance, would be considered

income and belong to the life tenant. True, the articles of incorporation of the company authorize it to buy, sell, improve, and lease real property, but it appears from the stipulated facts that this property was taken over by some of the directors of the First National Bank for the specific purpose of aiding the bank, and for the further specific purpose of holding and disposing of the same at the earliest opportunity and to the best advantage; that the company never bought any real estate after the death of Mr. Payne; that it sold property from time to time when it could do so to advantage; that its sole purpose was to close out all the properties as soon as practicable, distribute the proceeds among its stockholders, and dissolve the corporation. We have therefore come to the conclusion that this property was held by the corporation the same as any other property is held by an individual or corporation that desires to sell the same at an advantageous price, in the meantime making some improvements thereon and leasing the same to the best advantage. We deem that the company was not such a trading corporation in real estate as is referred to in the cases cited by counsel for *Mrs. Payne.*

It is urged that at least forty-seven per cent. of the dividend declared should go to the life tenant, because it appears from the undisputed facts that at the time the dividend was declared the net income from the properties of the company from rents, interest, and dividends on stocks owned amounted to $47,540.65, and that therefore it must be assumed that this amount of money derived from admitted earnings was included in the dividend declared. The difficulty with the claim is that it was stipulated by the parties that "the money distributed to the stockholders of St. Paul Avenue Improvement Company as such fifty per cent. dividend were funds received from Milwaukee Terminal Railway Company as a final payment upon its land contract for the purchase of part of the properties of St. Paul Avenue Improvement Company which was entered into about December, 1905." It therefore

appears that, while the company had funds derived from earn-
ings out of which a dividend might be declared, the dividend
in question was not declared out of such funds.   We are
here called upon to determine what disposition the trustee shall
make of the dividend actually distributed.   The fact that the
company has on hand earnings out of which a dividend may
hereafter be declared is immaterial so far as the present ques-
tion is concerned.   It follows, therefore, that the trial court
properly held that the dividend of $100,000 declared by the
St. Paul Avenue Improvement Company belonged to *corpus*
and not to income.

Counsel for *Mrs. Cameron* admits that if it should be held
that the trust estate vested at the time of the death of the
testator, then the dividend declared by the National Surety
Company should go to *Mrs. Payne,* as the undisputed proof
shows it has been earned since that time.   The conclusion
reached as to the time of the vesting of the trust estate, and
the admission of counsel, based as it is upon the undisputed
facts, dispose of such dividend in harmony with the conclu-
sions reached by the trial court.

The dividend of $532,617.12 declared by the First Na-
tional Bank of Milwaukee to its stockholders on the 15th day
of May, 1911, was charged against and paid out of the un-
divided profits of the bank.   The fact, however, that it was
charged against and paid out of a fund denominated undi-
vided profits, is not conclusive between the life tenant and
remainderman.   *Soehnlein v. Soehnlein,* 146 Wis. 330, 131
N. W. 739.   The claim is made in behalf of *Mrs. Cameron*
that the dividend was never properly segregated from the
*corpus* of the capital of the bank, because it was used to pur-
chase a trust company which became an ancillary institution
to it, and that it was not declared out of earnings made since
the death of Mr. Payne.

It appears from the stipulated facts that all the stockhold-
ers of the First National Bank conveyed their interest in the

dividend in question to Fred Vogel, Jr., William Bigelow, and Fred T. Goll, as trustees, for the purchase of all the stock of the First Savings & Trust Company. Such conveyance by the trustee was consented to by both *Mrs. Payne* and *Mrs. Cameron.* The trust agreement provided for the holding and administering of all the stock so purchased for the benefit of all persons who were from time to time the stockholders of record of the First National Bank; and the evidence of ownership of the stock of the First Savings & Trust Company purchased with the dividend was indorsed upon the stock certificates of the First National Bank. As between remainderman and life tenant it is immaterial what the latter does with the dividend declared from income. *Soehnlein v. Soehnlein,* 146 Wis. 330, 131 N. W. 739. He may, as here, enter into an agreement with the other stockholders to purchase a trust company, or he may not. The bank declared the dividend and paid it over to the persons designated by the stockholders to receive it. The bank parted with its control over the money and it was not concerned as to what use the stockholders made of it. Neither does it concern the remainderman what use the life tenant makes of earnings payable to him. The money in question was segregated from the *corpus* of the property of the bank and, in effect, paid to the stockholders, because paid to the persons lawfully designated by them to receive it.

Was the dividend derived from earnings of the bank accruing since the commencement of the trust estate? If it was, then it belongs to the life tenant; if not, to the remainderman; and if partly earned since and partly before the trust estate vested, then in part to each. *Soehnlein v. Soehnlein, supra.* The presumption is that a dividend declared on corporate stock is declared out of income, and an efficient showing to the contrary must be made to successfully rebut such presumption. *Soehnlein v. Soehnlein, supra.* The dividend in question purports to have been declared out of undi-

Miller v. Payne, 150 Wis. 354.

vided profits, and the burden therefore rests upon the remainderman to show that it was not. From the stipulated facts we reach the conclusion not only that the presumption has not been overcome, but that the proof is quite persuasive that the whole dividend was in fact paid out of earnings accruing since the commencement of the trust estate. The tabulation presented by counsel for *Mrs. Payne,* and based upon the stipulated facts, in our judgment shows that the whole dividend was derived from profits earned since the commencement of the trust estate. The tabulation is as follows:

| | | |
|---|---|---:|
| Capital, surplus and undivided profits of bank on February 5, 1906, which included $256,651.28 of recoveries during first period, as per stipulation. | Capital .......... | $2,000,000 00 |
| | Surplus .......... | 350,000 00 |
| | Undivided profits.. | 53,321 50 |
| From February 5, 1906, to December 31, 1909, surplus and undivided profits were increased in the amount of....................... | | 508,241 26 |
| Of this amount recoveries on assets previously charged to profit and loss contributed....................... | | 238,099 90 |
| Leaving balance contributed by current earnings for the period................................. | | $270,141 36 |
| From December 31, 1909, to declaration of dividend, surplus and undivided profits were increased other than from premium on new shares ($500,000 at 170) in the amount of...................................... | | 158,924 24 |
| Of this amount recoveries on assets previously charged to profit and loss contributed....................... | | 33,236 76 |
| Leaving balance contributed by current earnings for the period................................. | | $125,687 48 |
| Add to this the item of current earnings in preceding period ........................................ | | 270,141 36 |
| Makes current earnings since February 5, 1906, applicable to dividend............................ | | $395,828 84 |
| At this point $500,000 new stock sold at 170 % as soon as sold had market value of 200 %. | | |
| Old stock on date of sale of new stock had book value of 153.5 % and market value of 200 %. | | |
| Proceeds of premium paid on purchase of new stock.... | | $350,000 00 |
| Of this 53.5 % paid to make book value of new stock equal to book value of old, or....................... | | 267,500 00 |
| Leaving balance of premium as profit on sale of new stock applicable *pro rata* on old and new stock... | | $82,500 00 |

After issue of new stock, old stock represented four
   fifths of outstanding stock.
Four fifths of profit from premium on sale of new
   stock was applicable *pro rata* to $2,000,000 of old
   stock—four fifths of $82,500, or...................... $66,000 00
Add:
   Current earnings on old stock since February 5,
      1906 ................................................ $395,828 84
   Profit from sale of new stock applicable to old...... 66,000 00

   Total earnings and profits on old stock since Feb-
      ruary 5, 1906.................................... $461,828 84
Amount of dividend actually declared, $532,617.12.
Of this four fifths paid on account $2,000,000 of old stock
   (four fifths of $532,617.12) makes the dividend on old
   stock to be deducted from above total earnings and
   profits on old stock since February 5, 1906............ $426,093 36

   Leaves balance earnings and profits since Feb-
      ruary 5, 1906, on old stock after deducting divi-
      dend paid on old stock......................... $35,735 48

It will be observed that in this accounting recoveries made
on assets previously charged to profit and loss account are
deducted from earnings. Such deduction is properly made.
Assets so charged off belonged to *corpus,* and whatever recov-
eries were made on them also belonged to *corpus.*

The distribution of the premium made on the sale of the
new stock is an equitable and just one. Fifty-three and five-
tenths per cent. of that went to make the book value of the
new stock equal the old. The difference between that and
170 per cent., at which the new stock sold, represented a net
profit to be distributed ratably between old and new stock.
*Holbrook v. Holbrook,* 74 N. H. 201, 66 Atl. 124, 12 L. R. A.
n. s. 768; *Eisner's Estate,* 175 Pa. St. 143, 34 Atl. 577.

Some claim is advanced that the profits made on the Colo-
rado coal lands should be regarded as enhancement of the
capital or *corpus* of the bank within the rule applied to the
St. Paul Avenue Improvement Company. Such claim has no
foundation in fact. The bank bought the lands like any
other asset, sold them, and made a profit. Had it bought in-
stead negotiable paper or bonds with the money invested in
the lands and made the same profit, the legal situation would
have been just the same. In either case the bank would have

made profits on assets purchased by it, and such profits belong to life tenant.

The trial court awarded *Mrs. Payne* the dividend of the First National Bank on 312½ shares of stock.   This included sixty-two and one-half shares purchased by the trustee March 1, 1911.   The dividend was declared in May, 1911. Her counsel now concedes that the amount of earnings on these sixty-two and one-half shares from the time of their purchase to the time the dividend was declared is too trivial to take into account, and that the judgment of the trial court should be modified by allowing her the dividend on only 250 shares of stock.   The judgment is directed to be so modified.

It is apparent from the whole proceeding that a real and a *bona fide* dispute arose between *Mrs. Payne,* the life tenant, and *Mrs. Cameron,* the remainderman, as to how the dividends in question should be divided.   It is also apparent that each of the parties, as well as the trustee, is interested in arriving at a just and fair settlement of such dispute.   It is conceded that the value of the services of the trustee in this matter in behalf of the estate is $500.   Under such circumstances the judgment of the trial court directing that the compensation of the trustee be paid equally out of *corpus* and income must be sustained.   *Mrs. Payne* and *Mrs. Cameron* are each equally responsible for the existence, and equally interested in the adjustment, of the controversy.   They should therefore share equally in the reasonable cost thereof.

*By the Court.*—Judgment modified as indicated in the opinion, and, as so modified, affirmed, without costs to either party.   The clerk's fees in this court to be paid by the defendant *Mrs. Payne.*

A motion for a rehearing was denied October 8, 1912.