SPLITTGERBER BROTHERS ET AL., APPELLEES, V. SKINNER PACKING COMPANY, APPELLANT.

FILED JANUARY 8, 1930. No. 26714.

*Ritchie, Chase, Canaday & Swenson,* for appellant.

*G. P. North* and *F. H. Pollock, contra.*

Heard before ROSE, DEAN, GOOD and DAY, JJ., and RAPER and REDICK, District Judges.

RAPER, District Judge.

Splittgerber Brothers, a partnership, appellees, brought this action against the Skinner Packing Company, to recover the purchase price of five sales of preferred stock in the appellant company, which appellees allege was induced by false representation. The petition sets out six causes of action. The first is based on a sale of 20 shares on June 18, 1918, for which plaintiffs paid $2,000; the second count related to purchase of 20 shares on May 16, 1919, for $2,500; the third count was found to be an error and was abandoned; the fourth count is on a purchase of 60 shares on May 27, 1919; the fifth count is on a purchase of 100 shares on July 31, 1919, for $7,500, one-half paid for in cash and one-half on note, a renewal of which was unpaid; the sixth is on a purchase of 50 shares on August 22, 1919, for $6,250, one-half of which was paid for in cash and the remainder by note, renewals of which were unpaid. There was trial to a jury, which returned a verdict for plaintiffs on the five causes of action for the amount of the purchase price of each purchase with interest, less the amounts of the notes that were unpaid. A separate finding was made on each count.

The alleged false representations made by one L. B. Hughes, agent for the appellant, on the first cause of action were: (a) That the stock in the Skinner Packing Company was worth and of the actual value of $100 a share; (b) that the said company at the rate it was making profits was making a sufficient sum to pay 30 per cent. per annum to each stockholder; (c) that Paul and Lloyd Skinner had invested $400,000 in cash of their own money in the company; and (d) that the agents (stock salesmen) were working on a salary but not on commissions. The court in its instructions, because of lack of evidence, took from

the jury all these allegations except the first. As to the allegation concerning value of the stock, there was no evidence to prove the stock was not worth $100 a share, so there was no evidence to support the verdict on the first cause of action. Bernard Splittgerber was the only witness who testified to the representations on all the different sales. He was informed that the company had been recently organized, and that stock would have to be sold to finance the building and equipping of a large meat packing plant, and that very little had been done in executing the work except to purchase land and doing some grading, and he must have known that the value was problematical, and no one could foresee definitely the outcome, or the success of the venture. Under those circumstances he was not justified in relying upon a representation that the stock was of the value of $100 a share. It follows that the first cause of action should be dismissed.

On the four causes of action for the 1919 sales, plaintiffs in their petition allege certain false representations made by defendant's stock salesman, of which the court submitted to the jury the following: (a) That the stock was worth $125 a share; (b) that the company at the rate it was making profits was making sufficient to pay 30 per cent. dividends on all the stock; (c) that Paul and Lloyd Skinner had invested $400,000 in cash of their own money in the company; (d) that the company was making and had made large profits and had paid a dividend from the profits; (e) that the company had paid a dividend, which had not been paid from profits. Plaintiffs further allege that at the time of each purchase they informed the salesman that they were inexperienced in dealing in stocks and securities and knew nothing of the packing business nor the value of stocks nor the manner of ascertaining the value of same, and plaintiffs were assured by the salesman that they knew the value of the stock, and that plaintiffs could rely upon said representations, particularly as to the value of the stock, and that plaintiffs did believe and rely upon said statements. Plaintiffs allege that they first learned of the falsity of said state-

ments immediately before January 25, 1921, at which time they notified defendant of their election to rescind, and tendered back their stock and demanded the money they had paid therefor.

Bernard Splittgerber, who transacted all the business in connection with the sales, testified about the sale of May 16, 1919, that one Call, defendant's stock salesman, came to his home and asked if he had received a dividend on his stock, and witness told him "Yes," and Call then told him about how the plant was getting along and that they were building on it, about how long it would be before they started to operate the plant and that everything looked good, that the produce department was doing better than it did in 1918 up to that time and that it had earned around 15 per cent. or a little better up to that time on the capital stock; that witness could not buy the stock for $100, for they were selling it all over for $125 and that it was really worth more, and Call explained that the increase in value of land they had purchased and profits of produce department and business done in handling hams and bacon amounted somewhere around better than 40 per cent., almost 50 per cent., that is, it would amount to that if they kept on going at the rate they were going then, and that the Skinner boys had invested $450,000 of their own money in the stock, and that they were building or having built a large number of refrigerator cars; that Call told him that after the 8 per cent. dividend was deducted there was about 22 per cent. left in the treasury, and that with what they had already earned in 1919 added to the 22 per cent. already in the treasury would make 50 per cent. or more, and that, Call said, would make the stock really worth more than $125 a share. On May 27, 1919, Merrill and Call, defendant's stock salesmen, again visited Bernard at his home, and wanted Bernard to become a member of an advisory board. They talked about their packing plant and how good everything was going and wanted to sell Bernard more stock, and "they told me about the same stories that the other salesmen had been telling, and they said things were getting

better all the time." Bernard went to Omaha about the middle of July, 1919, and testified he met Robertson, treasurer of the company, and both Paul and Lloyd Skinner, and that one of the Skinners, in their office, told him they had invested $450,000 of their own money in the plant, and that he asked them, in the office, if things were going as good as the stock salesmen had been telling him, about making so much profit on the produce department, and one of the Skinners told him, even better; and they had Bernard's picture taken, and Robertson took him to see the plant. He did not say that he told the men in the office just what the stock salesmen had told him. About two weeks after the Omaha visit Mr. Call again came to Bernard's home, but no statement was related by Bernard as to what Call then represented to him, but he bought 100 shares at $125 a share. The subscription was made July 31, 1919. Again on August 22, 1919, Call visited Bernard and 50 more shares were purchased, but nothing is stated as to what Call told him at that time. On cross-examination Bernard said that Hughes, the first salesman, told him the stock salesmen were being paid a salary and were not working on a percentage basis, and that the salesman put down figures to show the earnings and what the stock was worth, but witness knew nothing of the way to estimate value of stock and relied on what the salesman told him. He testified on cross-examination that he knew the company had to sell stock before it could operate, and that he did not know how much stock had been sold when he made his purchases; that he did not know whether the salesmen on May 27, 1919, talked the whole thing over, but did recite some that were in accord with his direct testimony. There are some other matters testified to, which need not here be extended. Bernard's deposition was taken by the defendant in October, 1927. Several statements he made then were at variance with those given by him in court. His testimony in many respects is not very satisfactory, but the jury saw and heard him, and it was for the jury to say what degree of credit should be given to his testimony.

It was disclosed in the evidence that the Skinner Packing Company was organized about March, 1918, for the purpose of establishing a meat packing business on an extensive scale to compete with other large packing houses, and during all the years 1918 and 1919 was purchasing land and erecting buildings at a very large expense. While that was in progress the company engaged in a produce business buying and selling produce and meats. The work kept progressing during the next few years, but the packing plant was not in operation till some time after Splittgerbers' last stock purchase. The company asserts that there was a large increase in the value of the land that had been bought, and that the produce department had made profits, and with those profits, and interest on the notes given by purchasers of the company's stock and interest and appreciation of other securities, a dividend of 8 per cent. was properly and legally paid at the end of 1918, but the company does not contend that in 1919 it was making 30 per cent. profit or had made 15 per cent. at the time of plaintiffs' purchases in 1919, nor does it claim that the agents were paid a salary for selling stock, but this was withdrawn from the jury. Paul and Lloyd Skinner had subscribed for $400,000 of the stock, for which Paul gave Liberty bonds for $25,-000 and his notes for $175,000, and Lloyd had given a check for $25,000, which was carried as cash, and $175,000 in notes. The check for $25,000 was never cashed and the Liberty bonds and check and their notes were turned back to them and their stock certificates canceled in June, 1920. Defendant contends that the value of the notes must be considered as the equivalent of cash, unless it affirmatively appears that the notes were not collectable, and inasmuch as no evidence was received to prove the notes were not collectable, the alleged representation that the Skinners had invested $400,000 in cash in the company must be presumed to be the truth. It was the custom of the company to sell stock for cash or part cash and part on time for which notes were given, and where notes were given the company held the stock as collateral. We do not concede that these

subscriptions of Paul and Lloyd Skinner, under the situation developed in this case, are the equivalent of a stock purchase for cash in those amounts. As the work progressed the company was a heavy borrower of money to carry on the project, and if these shares to the amount of $400,000 had been paid for in cash, one can readily see that it no doubt would have greatly strengthened the company's resources. The court at appellant's request instructed the jury that a note which is collectable is the equivalent of cash, and that if the jury found from the evidence that Paul and Lloyd Skinner had put into the company cash or its equivalent in notes which were collectable, the jury should disregard the allegations that the Skinners had invested the $400,000 in the company. The appellant cannot now complain of such submission to the jury.

In regard to the alleged false representation that the company had paid dividends from profits, at appellant's request the court instructed the jury that profits of a corporation include earnings from the operating departments, increases in values of properties purchased at figures less than they were worth, or that increased in value after the purchase, and earnings from interest on notes, Liberty bonds or other securities owned by the corporation; and the court further instructed the jury that the fact that an appreciation in real estate as shown by an appraisal was entered on the books of the company is not evidence that such appreciation so entered on the books of the company did not correctly reflect an increased value of the real estate. The testimony shows that on August 1, 1918, the Southwestern Appraisal Company made an appraisal of the real estate of the company and placed its value at $372,-779.55, which property had cost the company $98,661.67, and on December 7, 1918, the directors authorized and directed the auditor to "set up" the appraised value to the end that the records might show the actual surplus in the company's financial affairs, and on the same date declared an 8 per cent. dividend on preferred stock, the dividend to be paid in cash to holders of shares fully paid for, and that

dividend be credited on the unpaid notes given for stock. It is disclosed by the evidence that the net surplus profits from the produce department was $3,504.77, and the increase in value of property, interest on notes given by stockholders of about $48,000 and interest then due on bonds and other securities of about $47,000, and that out of these surplus earnings and the appreciation in the value of their properties the company paid to stockholders in cash $56,000, and credited $48,000 on notes of stockholders. Under the instructions of the court that the increase in appraised value of the property should be accepted as the true value of those assets, the payment of the 8 per cent. dividend was justifiable.

"All dividends on corporate stock, in the absence of any efficient showing to the contrary, are presumed to be out of income." *Soehnlein v. Soehnlein*, 146 Wis. 330.

"The term 'net profits' or 'surplus profits' may be defined as what remains after deducting from the present value of all the assets of a corporation the amount of all liabilities, including capital stock, in other words, that which remains as the clear gain of a corporation, after deducting from its income all expenses incurred and losses sustained in the conduct and prosecution of its business." 14 C. J. 802. See, also, *Miller v. Bradish*, 69 Ia. 278.

The court in its instructions told the jury that it was for them to determine whether the defendant had profits or earnings out of which a dividend could have been paid, and defined a dividend as the profits of a corporation apportioned among its stockholders, but did not state what could properly be considered as profits. But the court instructed, at defendant's request, that, unless the jury found from the evidence that the plaintiffs understood that this dividend was paid exclusively from the operation of the business of the company, the allegation concerning the 8 per cent. dividend should be disregarded, and that, if plaintiffs understood that the dividend was paid out of a fund created in part by earnings from the operation of its business and in part from increase in value of its real estate and otherwise,

the allegation concerning the dividends should be disregarded. The defendant, therefore, cannot now claim that there was error in submitting to the jury the right of the company to declare the 8 per cent. dividend in December, 1918.

It is contended that the testimony of J. J. Buresh as to the value of the stock in 1919 was improperly admitted. He was plaintiffs' only witness on that question. He was auditor of the company from April, 1919, to March, 1921. The company's general ledger for 1918 and 1919 was lost, except a part of it consisting of some loose leaves, which were used by him, but which are not attached to the bill of exceptions. He testified that without that book he could only give estimate of the value of the stock from his memory of the company's condition. He testified that he knew how much stock was outstanding and what the book record showed were the assets and liabilities and from time to time made financial statements from the books, and would know the value of the stock in 1919, and "Well, I will say after eliminating certain items that I knew from working there that the stock would probably be worth $50 to $60" a share, and that the items he eliminated were promotion account and the amount paid for selling the stock, and their admission in the answer was placed in evidence that $487,100 of common stock and preferred stock of $5,997,950 at par value were outstanding, and of that amount $721,597 of subscribers' notes were not paid and are uncollectable, and that no stock was sold after December 20, 1919; and witness testified that the uncollectable notes would reduce it materially, but could not say how much unless he had the rest of the figures; that the company paid over $1,000,000 for selling its stock, that he took into consideration such uncollectable notes and these uncollectable notes would reduce the value $10 a share. On cross-examination he testified that, when subscribers' notes were given for stock, the stock was held by the company as collateral, and if the notes were not paid, stock to the amount of the unpaid notes would be canceled and the amount of stock outstanding would automatically be reduced accordingly, and

that on December 31, 1920, as auditor, he made and signed a statement showing that the book value was $115 a share, and in June, 1920, he, as auditor, prepared a statement showing that the total assets at cost was $8,565,494.13, and deducting cost of promotion amounting to $848,121.55, or a representation to the investors of $104 a share. Add to this the increased value of the property, $1,500,000, and you have a total value of $9,217,372.85, or a relative value of $124 a share, after deducting all costs of promotion and organization; that he did not know how much Liberty bonds were on hand in July, 1919, but would say $500,000 or more, maybe $600,000; did not know how much had then been expended on cost of real estate, equipment and building; certificates of deposit then held were around $500,000 to $600,000; cannot remember how much cash was then on hand; could not remember the amount of stock then outstanding; that the promotion organization expenses in July, 1919, were around $300,000 to $400,000; did not know amount of stock sold between July and December, 1919, when stock sales ceased. His testimony plainly shows such' lack of knowledge of the assets and liabilities that his testimony was incompetent.

Much time was devoted in the trial to show that Bernard Splittgerber knew, or was possessed of sufficient facts from which he should have known, as early as July, 1920, the facts concerning the alleged false representations, and was guilty of laches in waiting until January, 1921, to rescind. There are several circumstances which indicate that he might have known in July, 1920, the true condition of the company, in so far as affected the falsity of the representations, but he denied positively any such knowledge, and it was for the jury to say when he discovered, as he alleged, the falsity of the salesmens' statements. Among other circumstances urged by defendant was that Bernard had been appointed a member of an advisory board. There is nothing in this appointment that estops him from rescinding. The court instructed the jury that, if they found that plaintiffs discovered the fraud, or were put upon inquiry or had

good reason to discover the fraud in the summer or early fall of 1920, a rescission as of January 25, 1921, or thereabouts, was too late, and that, if they so found, they should return a verdict for defendant, so that issue was fairly submitted to the jury.

Appellant urges there was error in receiving improper testimony, part of which was later withdrawn. Mr. Ritchie, defendant's attorney, was the first witness called by plaintiffs, and two letters were admitted which he had written and sent out to the stockholders in the early part of January, 1921, in which he urged stockholders not to sue the company, but if they had a grievance to come before the directors, and stated that the stock was worth $100 a share, and explained some reasons for losses and troubles the company was having. Those letters are not relevant, but after the letters were admitted Mr. North asked Ritchie, "And in that letter you advised this man Taylor (to whom one of the letters was written) that he had better not sue the company, and he did and got judgment against the company, and it was paid? A. Yes; over my protest. Q. In this court, didn't he? A. Yes. Q. For $14,750? A. Yes. And then Mr. Ritchie went on to explain. In fairness to the court, it will be noted that there was no objection to these questions, but they were highly improper.

Another feature along this line occurred when plaintiffs' counsel charged that Mr. Ritchie was representing the Skinners in this suit. Mr. Ritchie denied that he was acting for the Skinners, and stated he had received no compensation from them. At the inception of this case Paul and Lloyd Skinner and the Skinner Manufacturing Company were made defendants, and Mr. Ritchie filed a demurrer for Lloyd Skinner and the Skinner Manufacturing Company, and a special appearance for Paul Skinner. These parties were later dismissed from the case, leaving only the Skinner Packing Company defendant. When Mr. Ritchie denied that he was acting for those parties, the plaintiffs introduced in evidence the demurrers and the special appearance. Afterward the court withdrew them from the jury.

It was immaterial whether Mr. Ritchie had been attorney for those parties or not. If that had been the only attack on Mr. Ritchie, the subsequent withdrawal of those pleadings probably would have cured the error.

Misconduct of plaintiffs' attorney is another alleged error. The plaintiffs' attorney admits that some of the questions and statements of plaintiffs' counsel may have been ill-advised, but claims that the alleged misconduct of appellees' attorney were invited by defendant's counsel. The record shows many flagrant violations by both attorneys of the rules that should govern counsel in the trial of a case. At one time, a reference having been made about filing claims with the receiver, Mr. North said to Mr. Ritchie, "Mr. Ritchie, do you mean to say that you don't know that you disposed of hundreds of claims in that receivership?" Mr. Ritchie: "Claims?" Mr. North: "Claims of stockholders canceling their contracts." Some questions were asked the witness Buresh about Mr. Ritchie going into federal court as attorney for the company and making arrangements for the appointment of a receiver, and that Mr. Ritchie and two other attorneys became attorneys for the receiver. Objection to this was sustained. Another question asked the same witness if checks for attorney's fees in the spring of 1920 for Mr. Ritchie were made payable to him or to Skinner and Robertson. Objection to that was sustained. Another question was whether Mr. Ritchie was interested in the pay he was getting. Objection sustained. Mr. North then asked, "All right, I want to ask you whether you think that Mr. Ritchie was doing the best he could for the Skinner Packing Company, or whether you thought he was doing the best he could for Paul and Lloyd Skinner and Dr. Gilmore, directors of the company, that gave him his job?" At the court's suggestion the words "that gave him his job" were omitted, and the witness answered, "Well, I thought he was working in the interest of Paul and Lloyd Skinner and Dr. Gilmore. I know he had been the private attorney for Dr. Gilmore, prior to the trouble." Another question was asked, who was the lawyer for the company

when the contract, known as the "Dold" contract, was made and who checked and approved it, and afterward Keith Neville, receiver, said was very detrimental to the Skinner Packing Company? This was not answered. There were other instances where plaintiffs' counsel asked questions to which objection was sustained and counsel persisted in repeating same in substance. Mr. Campbell, a witness for defendant, was asked on cross-examination whether he knew false representations were made to one Theo. Huettner about sale of stock, and whether Huettner rescinded as soon as he learned of it. There are other similar episodes, which it is unnecessary to set out. The instances above cited were not invited by defendant's counsel. There were frequent bitter verbal clashes between the attorneys, for many of which defendant's counsel was responsible. These exchanges of personal charges and recriminations were so frequent that Judge Wakeley, who was ill near the close of the three weeks trial, stated he was unable to cope with counsel, and gave up that part of it. Throughout the record the trial judge, distinguished for learning and probity, appears as a grieved observer of continued improprieties which he felt himself unable to suppress. It is clear that he was unable to end them by admonition and entreaty.

Appellant urges error because the court gave several instructions marked "Instruction asked by defendant." This court has frequently advised against the propriety of so marking instructions. In this case the instructions were given before the arguments. In Mr. Chase's opening argument for defendant, he read one of the instructions which has been given. Mr. North said, "May I ask you whether this is instruction No. 4 of the court's instructions, or whether it is instruction No. 4 of the instructions requested by defendant Skinner Packing Company?" Mr. Chase: "It was an instruction, I think, prepared at our office, but given by Judge Wakeley." Mr. North: "It is the Skinner instruction No. 4, as requested by the Skinner Packing Company." The effect naturally would be to disparage the instructions.

The first petition was filed against the Skinner Packing Company on November 21, 1923, and an attachment then issued on affidavit of plaintiffs' agent that they claimed due them $30,750 and interest, total amount $37,231.32, and that he believed plaintiffs should recover that amount and that defendant was a nonresident. On November 28, 1923, an amended petition was filed, bringing in new parties. On December 28, 1923, one Canaday was appointed receiver of the company. On January 26, 1924, the original and amended petition were on motion of defendant company stricken from the files and the case dismissed without prejudice. On February 2, 1924, at the same term, the court entered an order amending its order of January 26, stating that it was not the intention of the court to provide for a dismissal of said cause which would result in automatic discharge of the attachment, and the order of January 26 was modified and corrected as follows: "Wherefore, it is ordered, adjudged, and decreed that the petition and amended petition and motion to strike from the files previously filed by the plaintiffs here be and are hereby stricken from the files of this court, without prejudice, and the plaintiffs are allowed 10 days from this date to file an amended petition." Appellant and the receiver moved to discharge the attachment because the affidavit did not correctly state the amount that plaintiffs believed they were entitled to recover, and also moved to quash the attachment because the original and first amended petition were stricken from the files and the attachment thereby discharged, and during the time between the order striking the said petitions from the files Joseph H. Canaday was appointed receiver by the district court for Douglas county.

The striking of the original and amended petition from the files with leave to file an amended petition in 10 days did not have the effect of terminating the case. The same causes of action were in the stricken pleadings as in the petition on which the case was tried. It was done at the same term of court, and the court had jurisdiction, and the striking of the petitions did not discharge the attachment.

For the errors above set out, the verdict and judgment on the second, fourth, fifth, and sixth causes of action are reversed and remanded to the district court for new trial. The first cause of action is dismissed.

REVERSED.